UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN ARTHUR HANRATTY,<br><br>Defendant. | 24 Cr. 153 (LGS) |

**DEFENDANT JOHN ARTHUR HANRATTY'S SENTENCING BRIEF**

**GUSRAE KAPLAN NUSBAUM PLLC**

Kari Parks
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com

*Counsel for Defendant John Arthur Hanratty*

**TABLE OF CONTENTS**

TABLE OF CONTENTS i

TABLE OF AUTHORITIES iii

BACKGROUND 1

I. Since Childhood, John has been a Hard Worker and People-Pleaser 2

II. John's Former Bosses and Other Securities Professionals Made Equity Investments in Ebury 4

III. The Government Argued that John Stole from EBCC Because He was Afraid of Ebury's Investors 6

IV. Years Before He Became Aware of this Criminal Case, John Began Trying to Repay EBCC and Ebury Investors 9

V. For the Two Years Since His Arrest, John has Prioritized Sobriety and Finding New Ways to Care for His Family 11

STANDARD 21

ARGUMENT 23

I. The PSR Incorrectly Calculates the Offense Level, Guidelines Range, and Restitution 23

II. Probation's Recommendation of an Eight-Plus Year Sentence Pursuant to Section 3553(a) Appears to be Based on Incorrect Facts and Unsupported Assumptions 27

III. A Six-Month Sentence Would Reflect the Courts' and Sentencing Commission's Evolving Understanding of How to Punish Fraud 29

IV. Six Months of Incarceration is "Sufficient[] but Not Greater than Necessary" to Serve the Congressionally-Mandated Purposes of Sentencing 36

CONCLUSION 40

## TABLE OF AUTHORITIES

**Cases**

Balaber-Strauss v. Lawrence, 264 B.R. 303, 305 (S.D.N.Y. 2001) (Hardin, B.J.) 40

Gall v. United States, 552 U.S. 38 (2007) 21

Kimbrough v. United States, 552 U.S. 85 (2007) 20

Nelson v. United States, 555 U.S. 350 (2009) 21

Pepper v. United States, 562 U.S. 476 (2011) 34

Tapia v. United States, 564 U.S. 319 (2011) 20

United States v. Adelson, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (Rakoff J.), aff'd, 301 F. App'x 93 (2d Cir. 2008) 31

United States v. Algahaim, 842 F.3d 796 (2d Cir. 2016) 31, 32, 40

United States v. Coppola, 671 F.3d 220 (2d Cir. 2012) 27

United States v. Corsey, 723 F.3d 366 (2d Cir. 2013) (Underhill, J., concurring) 29

United States v. Cuti, No. 08 Cr. 972(DAB), 2011 WL 3585988 (S.D.N.Y. July 29, 2011) (Batts, J.) 24

United States v. Ebbers, 458 F.3d 110 (2d Cir. 2006) 23

United States v. Emmenegger, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) (Lynch, J.) 31

United States v. Faibish, No. 12-cr-265 (ENV), 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015) (Vitaliano, J.) 30

United States v. Goodrich, 12 F.4th 219 (2d Cir. 2021) 25

United States v. Gupta, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) (Rakoff, J.), aff'd, 747 F.3d 111 (2d Cir. 2014) 30

United States v. Johnson, No. 16-CR-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) (Garaufis, J.) 30

United States v. Olis, 429 F.3d 540 (5th Cir. 2005) 23

United States v. Park, No. 16-cr-473(RA), Dkt. 44 (S.D.N.Y. Aug. 1, 2017) (Abrams, J.) 30

United States v. Parris, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) (Block, J.) 31

United States v. Pina, No. 18-CR-179-JSR, 2019 WL 1904920 (S.D.N.Y. Apr. 11, 2019) (Rakoff, J.) 23

United States v. Rainford, 110 F.4th 455 (2d Cir. 2024) 29

United States v. Reifler, 446 F.3d 65 (2d Cir. 2006) 25

United States v. Rutkoske, 506 F.3d 170 (2d Cir. 2007) 23, 24

United States v. Stewart, 590 F.3d 93 (2d Cir. 2009) 38

United States v. Tavberidze, 769 F. Supp. 3d 264 (S.D.N.Y. 2025) (Rakoff, J.) 26

United States v. Thompson, 19 Cr. 698 (ER), Sentencing Tr. (S.D.N.Y. Feb. 4, 2021) (Ramos, J.) 30

United States v. Tournant, No. 22 Cr. 276 (LTS), Dkt. 177 (S.D.N.Y. Dec. 6, 2024) (Swain, J.) 24

United States v. West Coast Aluminum Heat Treating Co., 265 F.3d 986 (9th Cir. 2001) 24

Wasman v. United States, 468 U.S. 559 (1984) 34

**Statutes**

18 U.S.C. § 3553(a) 20

28 U.S.C. § 994(c) 21

28 U.S.C. § 994(j) 21

**Other**

Department of Justice National Institute of Justice, Five Things About Deterrence (June 5, 2016) 36

Ellen Chayet, Elin Waring, and David Weisburd, Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, National Criminal Justice Reference Service (Nov. 21, 1994) 36

Office of Probation and Pretrial Services, Administrative Office of the United States Courts, Pub. 107, The Presentence Investigation Report at V-5 (Mar. 2006) 21

United States Sentencing Commission, Proposed Amendments to the Sentencing Guidelines (Preliminary) (Dec. 12, 2025) 30, 31, 32

United States Sentencing Commission, SDNY Statistical Information Packet (FY 2023) 36

USSG § 2B1.1(1) 25

USSG § 2B1.1(b)(2) 25

USSG § 3E1.1(b) 25

Defendant John Arthur Hanratty respectfully submits this memorandum in advance of his January 20, 2026 sentencing and requests that the Court sentence him to no more than six months' incarceration, plus restitution and / or forfeiture as the Court finds necessary to compensate victims' actual fraud losses and disgorge any criminal proceeds, is the "just punishment" for John's crimes.

**BACKGROUND**

Two years and four days ago, John Hanratty woke up to guns pointed at his and his then-wife's faces.

At about five o'clock in the morning, one week before Christmas 2023, FBI agents ambushed the Hanratty home where John had been passed out drunk and his three children and wife had been sleeping, which they had been renting in a suburb of San Juan, Puerto Rico. The agents did not present an indictment or tell John why they commanded him to come outside with his hands up; eventually, they told him that the Government had charged him with bank fraud and asked him to talk about borrowing bases one of his company "**Ebury's**" employees, Franklin Gandol, had sent to Emigrant Business Credit Corporation ("**EBCC**"). They handcuffed John in front of his family and neighbors, perp-walked him to a waiting police car, and drove to San Juan, where John was cuffed to FBI furniture for the next several hours before being presented to a magistrate in San Juan federal court.

Despite the guns and the cuffs and the lights and the bullhorns, later that day, the Government told the Puerto Rico judge that John would need to appear before a judge in the Southern District of New York ("**SDNY**"), where he had been charged on a criminal

information, not an indictment; that they did not believe John was a flight risk; and that they therefore did not object to the Puerto Rico judge releasing John and allowing him to travel to SDNY, without any law enforcement escort, on the very same flight that he and his family had already booked to visit their parents for Christmas.

And despite continually telling the Courts and undersigned counsel that this criminal case arises out of the very same 2018–2020 conduct that EBCC had been privately prosecuting in the Commercial Division for fifteen months before federal agents brandished their guns at John and his wife, the Government has never explained why it chose to arrest John at home in Puerto Rico where his children were sleeping, a week before Christmas, on an information, instead of obtaining an indictment and contacting undersigned counsel or one of John and Ebury's Puerto Rico or restructuring lawyers and allowing him to self-surrender in San Juan or New York.

How did we get here?

## I. Since Childhood, John has been a Hard Worker and People-Pleaser

In many ways, John Hanratty is a very normal American who had a relatively common middle-class childhood and a moderately successful and upwardly-mobile upper-middle class career before founding Ebury, which sometimes did well, struggled in the late 2010s through the Covid-19 pandemic, stabilized a bit around 2021 and 2022, and hobbled along even after EBCC sued Ebury and John in the Commercial Division in September 2022, but likely will not recover from this criminal case and John's conviction. PSR ¶ 81; cf. Bureau of Labor Statistics, Survival of private sector establishments by

opening year (67.3% of American businesses founded in the fiscal year ended March 2014 had shuttered by March 2025).

John is 51 years old and the third of four siblings born to Bill and Margie Hanratty. PSR ¶¶ 53–54. Bill devoted 27 years to U.S. Navy and retired as an O-6 Captain and Margie worked as a homemaker, bookstore owner, and veterinary clinic manager, among other, more temporary jobs over the years that the family frequently moved due to Bill's military career. Id. ¶¶ 54–58. During John's childhood, Bill was deployed for months at a time, which was challenging for Margie and the kids, but John, his parents, and siblings all agree that overall, John had a good childhood, even in the shadow of some alcohol abuse. Id.; see also, e.g., Monica Hanratty Letter at 2 ("Our mother did her best, but the long separations were hard on her, and she struggled at times. During those nights when we heard her crying, it was John who would come into my room to comfort me. [ . . . ] Our childhood wasn't perfect, but as loving and a lot of the time filled with fun.").

John's family reports that since he was a small child, John has spent his "boundless energy" on bringing family and friends together and working very, very hard. See generally, e.g., Beth Hanratty Letter ("**BH**"); Monica Hanratty Letter ("**MH**"); Tristin Crotty Letter ("**TC**"). He was "the best pizza delivery guy for Danny's Pizza in high school"—so good that John's oldest sister "still run[s] into Danny's family at the grocery store and they talk about how hard-working John was"—and so committed to family gatherings that he not only organized annual outings for primarily New Jersey-based family to Buffalo Bills games, but one year, even "[went] all the way [to Buffalo] and

stayed in the parking lot with his infant son so that the rest of the family could go to the game." BH at 2–3; Joseph Crotty Letter at 1 ("**JC**").

John worked through high school, college at Fordham University, and Brooklyn Law School, from serving as a deckhand during summers with Military Sealift Command in Freehold to working part-time as a paralegal for Bear Stearns and in compliance for Merrill Lynch. BH at 2–3; PSR ¶¶ 75–93.

After graduating from law school and becoming licensed in New Jersey and New York, John worked for "**OTA**" LLC, which was a broker–dealer and privately-held hedge fund owned by Ira Levanthal and headquartered in Purchase, New York. PSR ¶ 87. John worked for OTA and Mr. Levanthal from April 2002 through August 2018, eventually becoming its Chief Compliance Officer. Id. ¶¶ 86–87. In the last few years that he was working at OTA, John began investing in tax liens. Id. ¶ 81–87.

## II. John's Former Bosses and Other Securities Professionals Made Equity Investments in Ebury

At first, John only used his own savings to buy tax liens. See John Hanratty Letter at 3 ("**JH**"). After Mr. Levanthal and John's OTA colleagues Jim Santori and Stephan Skinner learned more about John's side project, they asked to invest in the project that eventually would become Ebury. Id. ¶ 10.

Although Messrs. Levanthal, Santori, and Skinner invested in Ebury before 2018, the Government argued that they also are victims of John's bank and wire fraud, which began in October 2018 and ended in January 2024. See, e.g., Dkt. 43, Superseding Indictment ¶ 1 (Aug. 26, 2024) ("**S1**"); 4th Amended Bill of Particulars (April 7, 2025).

Michael and Wendy Erickson and Michael Salerno's contacts invested in Ebury in 2015 and 2016, with the Ericksons' contacts investing in additional tranches in 2017 and into early 2018. See Tr. 584:15–21 (Mr. Erickson testifying to the timing of his investments); see also Tr. 993:7–9 (Mr. Salerno testifying to the timeframe of his groups' investments). Messrs. Leventhal, Santori, Skinner, Erickson, and Salerno were all professional investors, and long before they invested in Ebury, most had been registered as associated persons with the Financial Industry Regulatory Authority ("**FINRA**"), investment advisers with the United States Securities Exchange Commission ("**SEC**"), or both. See, e.g., SEC Investment Adviser Public Disclosure ("**IAPD**"), Michael Martin Salerno; FINRA BrokerCheck, Ira Mark Levanthal; FINRA BrokerCheck, James William Santori; FINRA BrokerCheck, Stephan Daniel Skinner.

However, the Court instructed the jury that to convict John of bank or wire fraud, they had to find that he lied in order "to obtain" money or property. See Tr. 1726:12–15 (instructing the jury that "[a] scheme or artifice to defraud is a plan, device, or course of action to obtain money or property by means of false or fraudulent statements, representations, promises or pretenses). And while the SEC Division of Enforcement issued a formal order of investigation regarding Ebury Street Capital on May 17, 2021 for possible securities fraud that had been happening since "at least April 15, 2019," the Government's productions suggest that the SEC took no meaningful action on that order until after Mr. Hanratty's December 2023 arrest. The SEC has not initiated any enforcement actions against Ebury or John, and its limitations period to do so is five years. 28 U.S.C. § 2462.

Regardless, in order to be allowed to invest in Ebury, all of the investors certified that they were high-net-worth people and sophisticated investors who knew that their Ebury investments were high-risk private placements that could lead them to lose the entire principal that they placed with Ebury. See, e.g., DX-155 at 38. Besides the six households who have requested restitution from this Court, see PSR ¶ 122, Ebury had other investors whose investments Ebury redeemed years before this criminal case began.

Although Probation has identified 10 separate investor victims with total losses of $8,539,704.79, in reality, those 10 are actually six households, since Wendy Erickson invested through four separate accounts and Ira and Beth Levanthal invested through three separate accounts. See PSR ¶ 122.

## III. The Government Argued that John Stole from EBCC Because He was Afraid of Ebury's Investors

The jury convicted John of wire and bank fraud and the two § 1957 charges, which target Ebury's receipt of approximately $860,000 and $60,000 from EBCC on May 17, 2019 and January 13, 2020, respectively. Although John continues to maintain that he is actually innocent of intentionally lying to EBCC via any of the eight borrowing bases on which the Government pursued its prosecution, John has continually, openly admitted that considers himself responsible for Ebury; consistently accepted personal responsibility for losing EBCC's and Ebury investors' money, including for years before he knew that the Government was preparing criminal proceedings against him; and also has repeatedly admitted and expressed regret about not being more forthcoming with EBCC and Ebury investors. John has accepted the Court's invitation to provide his

perspective on the events giving rise to this criminal case and has detailed them in the letter that he is submitting contemporaneously with this brief.

The Government's theory of this case was never that John was driven was greed, or even ambition; indeed, the Government itself has emphasized that John did not collect one penny from his crimes, and did not even attempt to claim that John indirectly profited from his crimes in some other way, such as by inflating his own compensation or social status.

Instead, the Government's theory of the case has always been that John was scared. See, e.g., Tr. 1760:18–20. The Government argued that Ebury's investors—John's former bosses, the Salerno family, and the Levanthal family—all wanted their money back fast and had completely lost patience with John. See, e.g., id. 1760:21–1761:1. John had paid them back millions, but it wasn't enough. See, e.g., id. 684:1–8. Even as John was returning millions of dollars to Ebury investors, they still threatened to sue John if he did not pay them back more money, faster. See, e.g., id. 1760:21–1761:5.

Investors escalated their threats by physically threatening not John, but by slipping past a building doorman to confront John's wife when she was home alone, and by holding Ebury's controller, Ping Xie, who is about 5′5″ and slight of build, hostage in Ebury's Westchester office even when that investor knew that John was thousands of miles away. See, e.g., id. 1440:11–16 (Mr. Xie's testimony of Mr. Salerno's intimidating conduct in the Westchester office). So—even though the investors' own contracts state that John had sole discretion to redeem their investments in-kind, and to indefinitely delay repaying them at all—the Government argued that John was so desperate for these

attacks to stop that he caused Ebury to submit false borrowing base certificates to EBCC on eight separate occasions between October 2018 and January 2020. See, e.g., id. DX-155 at 67.

The Government never did explain why John was so desperate to repay Ebury investors that he stole from EBCC, yet stole millions less than those investors still claim to be owed. See generally Tr. The Government's only explanation for why John caused Ebury to pay EBCC $9,277,535.59 at the very same time that he stole $8,965,00 pursuant to the eight Disputed BBCs is that John did so in order to lull EBCC into believing that everything was fine. See, e.g., id. 1788:6–20; GX-903, GX-904, Gx-909.

The evidence at trial also showed that at the very same time that Ebury investors were threatening John, his family, and his employees, John's business associate—Government witness Thomas J. McOsker—had stolen approximately $3.5 million from Ebury and was claiming that he would soon pay Ebury back. See, e.g. Tr. 1190:13–20. When Mr. McOsker failed to make good on those promises, John caused Ebury to move out of the offices it shared with Mr. McOsker's companies and sue him the very next business day. See id. Mr. McOsker insisted that Ebury simultaneously pursue its claims against him in both Delaware federal and Puerto Rico court, but both cases were stayed during the pendency of this criminal case. See id. 1194:8–18. EBCC and the Government have never accepted Mr. Hanratty or Ebury's offers to assign their rights against Mr. McOsker and his companies.

Despite the pressures from investors and failed business partners, throughout the very same time that John stole from EBCC, he also made sure that Ebury continued to

pay EBCC "a few hundred thousand dollars a week" and that Ebury "was probably one of the better, if not the best performing loan[]" that EBCC had. Tr. 1532:5–16; 1536:15–1537:2.

Finally, although the Government has argued, and Probation has calculated, that the Court should include EBCC's full loan principal of $18,251,647.03 in Mr. Hanratty's loss amount (rejecting EBCC's demand for $30,370,000 in restitution), Ebury actually borrowed $8.965 million based off of the eight Disputed BBCs. GX 3001–09, GX 3010A, GX 3010B, GX 3013C, GX 3015–16. Because each of the false spreadsheets represents just a portion of its respective Disputed BBC, the total borrowed against all eight Disputed BBC's false spreadsheets is $3,935,844.21. Id. And since the evidence at trial shows that Ebury did own the assets on the October 23, 2018 Disputed BBC on that date, the total amount that Ebury actually borrowed based of the false spreadsheets is just $443,007.14—or over 41 times less than Probation's loan loss calculation. Compare id. with PSR ¶ 28.

Moreover, MTAG President Jim Meeks—the Government's own witness—explained at length how Covid-19 decimated the tax lien industry after Ebury's last advance from EBCC, and illustrated that after the Pandemic set in, even Ebury's MTAG-custodied liens generated 86% less revenue per lien than they had before the Pandemic began. Tr. 908:19–909:23.

### IV. Years Before He Became Aware of this Criminal Case, John Began Trying to Repay EBCC and Ebury Investors

Even accepting, as we must, that the jury simply does not believe that John is innocent, the Government has not contested the dozens of ways in which John made

himself even more vulnerable to EBCC, months and years after he stopped causing Ebury to borrow money from EBCC.

For example, throughout 2021, John continually executed new contracts with EBCC and signed over additional property as new collateral for EBCC in exchange for EBCC extending the credit lines' maturity dates from March to November 2021, despite having zero plans to ask to borrow EBCC for any more money.

Between November 2021 and August 2022, John had approximately 150 calls with EBCC and their respective restructuring counsel. JH at 8. At the time, John thought the purpose of those calls was to find a way for the Parties to refinance EBCC's debt, whether through payment plans or the participation of a new lender. Id. At trial, EBCC's own witnesses that revolving credit lines like Ebury's typically are "refinanced" by a new lender coming in to buy the debt—lenders do not expect that a private equity company will have so much cash saved that it can pay off the loan's balance. Tr. 158:25–159:10.

In August 2022, Mr. Hanratty executed a term sheet in which he not only acknowledged that he personally and Ebury were fully liable for Ebury's debts to EBCC, but also agreed to fulfill payment obligations established by EBCC, and even agreed he would be personally responsible for all of Ebury's debts. DX-431.

From September 2022 through December 2023, Mr. Hanratty caused Ebury and himself to fully participate in the civil case that EBCC filed in the Commercial Division that arises out of this case's exact same facts; in Ebury's first filings of the case, admitted its contractual liability to EBCC but affirmed that he would litigate only to defend against EBCC's fraud claims, which did not seek to recover any damages other than those EBCC

sought in contract; and even sat for two days of live deposition testimony in EBCC's lawyers' offices. See, e.g., Tr. 1377:24–1378:1 (recognizing that Mr. Hanratty's deposition in the Commercial Division case was on June 20 and 21, 2023). During those depositions—where John testified both in personal and corporate representative capacities—John repeatedly testified that he believed himself to be ultimately responsible for all of Ebury's failures and was willing to give EBCC a breach-of-contract judgment; never tried to lie to EBCC to borrow money; and never once invoked his Fifth Amendment rights. See, e.g., Commercial Division Dkt. 191 at 12 (EBCC acknowledging that "Defendants have admitted that they are liable for breach of contract.").

After the Government initiated this criminal case, John caused Ebury to file for bankruptcy, but was ultimately unable to complete that proceeding because this case's March 2024 Post-Indictment Restraining Order froze all of Ebury's assets and prevented it from being able to pay the legal, expert, or other fees necessary to wind up the company through the bankruptcy process. See generally PIRO, Dkt. 28 (Mar. 25, 2024). Nevertheless, John again testified in that bankruptcy proceeding, as well.

In his letter to the Court, John still holds himself responsible for Ebury's failures and EBCC and Ebury's investors' losses. See, e.g., JH at 2.

### V. For the Two Years Since His Arrest, John has Prioritized Sobriety and Finding New Ways to Care for His Family

Although John always has held himself responsible for Ebury's financial harms to EBCC, Ebury investors, and other stakeholders—including Ebury employees who lost their jobs—since his December 2023 arrest (and long before his August 2025 conviction),

John has reflected on the many other ways that he believes he let his community down and worked to become more resilient.

John has always worked hard and prioritized showing up for his friends and family. His siblings and uncle have written to the Court about how he has always organized family gatherings and traditions, "connect[ed] effortlessly with people of all ages" and from all walks of life, and has always been an "involved, caring father" who "embraced the challenges of fatherhood wholeheartedly." See, e.g., Monica at 1–2; EH at 1.

At time same time, John was far from perfect. Along with his energy and enthusiasm and hard work and kindness, he also felt that he needed to "control things, to please others[,] and to be a reactive, reflexive person." John at 1. He began drinking alcohol when he was a child and was pled guilty to driving under the influence on a navy base before he turned 21. PSR ¶ 52. In his early 20s, John again was arrested for an alcohol problem—public disorder—and again pled guilty and paid a crime. Id. After his mid-20s, marriage, and having children, John never again had legal troubles, until this case. See generally id.

However, John always did keep drinking, and by the time that he was trying to figure out how to deal with Mr. McOsker's theft from Ebury, says John, he "was a drunk[ and] a liar." John at 2. His parents and sisters write that in hindsight, John's struggles and stress became particularly obvious during the pandemic, but that they could not see how serious his problems were, between decades of John's seeming self-sufficiency and many

other family tragedies occurring simultaneously, including the untimely death of his sister-in-law. See, e.g., Margaret Hanratty Letter ("**Margie H.**") at 2.

Despite his stress and drinking, John still tried to do the right thing. At home, he continued to be a present and involved father. See, e.g., EH at 1–2. At work, says Dennisse Méndez-Baez, John was "a demanding leader" who "expected high standards and accountability," but also "constantly [expressed] a genuine concern for the well-being of his employees and their families." DMB at 1. "[W]hen natural disasters struck [Ebury] contractors in the Philippines, [John] immediately directed that financial assistance be sent to help them recover [ . . . ] reveal[ing] a side of him that valued humanity over profit." Id. at 1. When Ms. Méndez-Baez had difficulties after giving birth to her first child, "John's empathy and reassurance [ . . . ] left a lasting impression on [her]." Id. at 1–2. When Mr. Salerno trapped Mr. Xie in Ebury's office, John told Mr. Xie to immediately write Mr. Salerno a check, rather than escalating the matter with law enforcement, even though John was thousands of miles away in Puerto Rico. Tr. 1440:11–16.

However, John's stress and drinking only grew worse as time went on. John writes that he "was drunk and drank on multiple of the 150+ daily multi-hour calls with EBCC and its 10 people beginning at the maturity of my loan," between November 2021 and September 2022. JH at 1. John "was drunk at [his] deposition with [EBCC lawyers] Alexander [Willscher] and Austin [Mayron] at Sullivan and Cromwell" in July 2022—and was so practiced at drinking that undersigned counsel and my staff did not even notice, despite sitting next to John for approximately twelve hours, two days in a row. Id. at 1. John "drank when [he] exercised at 6am. [He] drank at work. [He] drank from a

coffee cup while doing zoom calls with [his] therapist," whom he began seeing after his arrest. Id.

The first couple of months after John's December 2023 arrest were confusing and volatile for the Hanratty family: they were shocked by the arrest, shocked to learn that John had not been holding up as well as they thought their resilient son / brother / nephew had appeared to be, and simply did not know what to do. See generally, e.g., BH at 1; Margie H. In the meantime, John's drinking was only getting worse. Id. at 1; JH at 1–2.

But John wanted to change. So in summer 2024, he asked his family to help him break his alcohol abuse. Id. John's brother drove from New Jersey to Rhode Island to pick John up, and back down to New Jersey so that John could admit himself into an in-patient rehabilitation facility, where he lived for 36 days. BH at 1; JH at 1. John has been sober since July 16, 2024: the day he entered rehab. JH at 1. John has remained sober despite this case's many challenges and collateral effects, including the end of his 20-year marriage.

Although John event went to work at Ebury's office the day he was arrested in San Juan, he has not collected any compensation from Ebury since over a month before his arrest. JH at 1; Commercial Division Dkt. 189 at 3–4 (Mr. Hanratty's description of his and Ebury's inability to pay a contempt fine due to lack of liquidity). Mr. Hanratty continued to try to save Ebury after his arrest, including by causing it to file for bankruptcy and offering to resign (which EBCC and the Government opposed). JH at 10. After his arrest, his longtime banks, including USAA, closed all of his family's accounts.

He has been living off of loans from his elderly, middle-class parents and, before his conviction, occasional manual labor offered to him by someone he met through rehab and Alcoholics Anonymous. JH at 2; PSR ¶¶ 84–85, 94.

Besides odd jobs, trying to keep Ebury afloat, preparing for the trial, and focusing on staying sober, John has spent the bulk of his waking hours taking care of elderly family members. See, e.g., Bill at 2. After decades of relatively high-earning desk work, John pivoted to caring for his uncle, who had a massive stroke, had no spouse or children and continues to present "massive emotional and physical issue[s]" for the Hanratty family, and helping his family care for his father, who has been fighting Parkinson's, prostate cancer, and bladder cancer since John's arrest, as well as his niece, who recently lost her mother to an undiagnosed heart problem. Id. at 2.

On September 21, 2025, John got steadier, part-time work as a delivery driver for a bakery, earning $23 per hour to work the 2:00–10:00am shift delivering bread around Providence. JH at 2; PSR ¶ 85. After his shifts, he spends time with his children, then does it all over again when he is in Rhode Island, where he rents a room to support his ex-wife and the children, only to spend the rest of the week in New Jersey, where he is helping his elderly family members.

John "has learned painful lessons by losing his money, his home, his business, and his reputation[,] but he also recognizes that he has the ability to start again, and he has." Beth at 2. Becoming financially and emotionally dependent on elderly parents can be difficult for many people, and has been a particularly acute change of circumstances for John, who believes that his need for self-sufficiency and control was a large driver of how

he harmed Ebury, EBCC, Ebury's investors, and his own friends and family. See Julia Humphries at 1.

John's recovery coach, who "ha[s] worked with many clients facing serious legal and personal consequences," believes that "John has distinguished himself by the sincerity with which he has engaged in the recovery process:"

> John has consistently demonstrated thoughtfulness, openness, and a willingness to confront difficult truths about himself. He has shown genuine remorse for his actions and has not attempted to minimize the seriousness of his conviction. Instead, he has used our sessions to examine the underlying factors that contributed to his behavior and to develop concrete strategies to ensure he does not repeat past mistakes. [ . . . ] From my perspective, he has approached this period not with resentment, but with humility and a genuine desire to change.

Matthew Fanning at 1–2; accord Ryan Abbott at 1–2 ("Mr. Hanratty engaged seriously in the recovery process and accepted responsibility for his conduct. [ . . . ] Since mid-2024, I have observed continued progress in Mr. Hanratty's sobriety, judgment, and sense of responsibility."); Julia Humphries at 1 ("During the last 2 years, he has become a valued leader in the recovery community. He keeps in touch with those he connected with at rehab and is a source of wisdom and support for a younger group of recovering addicts [ . . . ] I cannot imagine that his children might have to forego the benefit of his love and guidance for an extended amount of time.").

John's father writes that during the later stages of his Naval career, he often had to decide whether to open investigations into or recommend punishment for potential violations of the Uniform Code of Military Justice:

> As Captain, when I was in that position, it was for me to judge what was presented and if required a finding of guilt or innocence and the proper

punishment for the offense committed. Punishment could be severe. Loss of wages, loss of rank, loss of promotion and loss of freedom to leave the ship and in most serious referral to a Court Martial where a dismissal from the Navy and dishonorable discharge was possible.

Those different degrees of punishment are based upon many of the same factors you will use in your assessment of what is the "best" justice for John. That justice is both punitive and hopefully rehabilitative. It is that rehabilitation aspect of your considerations I wish to reflect on briefly.

In my cases, I had served with these men for months in close confines and observed daily interactions, heard all the rumors, had many inputs. I would use my training and experiences to evaluate and determine the best action called for. That training allowed me to eliminate any unfair prejudices. I was trained to separate those daily interactions with my crew to provide the best and most just decision on what the appropriate punishment should be. The good order and discipline of the command depended on that.

My assessment of John as detached as I can be, is that he is further along in the rehab process than what is, I suspect, normally brought before you.

John has in the past two (2) years been proactive in his attempts to rehabilitate himself before his own family, his extended family and society. This has been demonstrated by the following:

- Seeking clinical psychology help
- Self-admitting himself for inpatient rehab at Alina Lodge
- Sought and agreed to terms of in home rehabilitation that lasted nine (9) months
- Participated fully in a family support group that has strengthened his bonds with family and friends
- Commenced a reconstitution of his own family providing and accepting their companionship in order to make the divorce less of a burden on all concerned
- Has started to provide financial resources to his own family to the extent possible. In order to do that he has found two (2) jobs that will provide some relief
- Has maintained continuous AA involvement with daily meetings

[ . . . ] Please consider a punitive sentence that will allow him to pay his debt and still provides an element where he can see clearly that these last two years of recovery are the future.

Bill Hanratty at 3–4.

Finally, despite divorcing John since his arrest, his ex-wife writes to ask the Court to "consider the perspective of John's children and the role he plays in their lives:"

> From the moment our first daughter, M[] was born in February of 2008, John embraced the challenges of fatherhood wholehearted. [ . . . ] He learned patience and adaptability as Molly grew, whether that meant standing at the park while she wanted to swing instead of run, or adjusting his routines to meet her needs. As she grew older, John donated his time to coaching CYO basketball. He shared his lifelong love of the sport not by emphasizing winning, but by focusing on building confidence, setting attainable goals, and ensuring that every child felt included. He was always thrilled to watch each girl grow in confidence. Later, he continued giving back by serving on the board of the local YMCA. [ . . . ]
>
> As the demands on our family increased, John stepped up without hesitation. From ages two to eight, C[] battled colonic neuropathy, a condition that was difficult to diagnose and emotionally exhausting for her. [ . . . ] Later, during COVID, C[] struggled deeply with depression and ADHD. John remained present and engaged. [ . . . ] Today, she has matured into an incredibly thoughtful, deep-thinking child who adores her dad.
>
> [ . . . ] Like his sisters, G[] has his own unique challenges. He was diagnosed with ADHD and struggled with emotional regulation at a young age. John never dismissed these struggles or assumed G[] would simply "grow out of it." [ . . . ] Today, G[] is known by his teachers as a sweet, thoughtful, gentle presence in the classroom, and he proudly reads every morning before school. The bond between G[] and his father is deep. G[] confides in John about the changes he is experiencing as he grows, challenges and dynamics on the school playground, and his enthusiasm for sports statistics. These[] conversations reflect the trust, guidance, and emotional safety G[] feels with his dad.
>
> [ . . . ]
>
> John's children are grappling with the difficult and confusing reality that their father has committed a crime, yet they continue to love him unconditionally and rely deeply on his steady presence, guidance, and emotional support in their lives. Thank you for taking the time to consider the perspective of John's children and the role he plays in their lives.

Emma Hanratty at 1–2.

Although he has maintained his actual innocence of the crimes that the grand jury charged, John "accept[s] the decision of the 12 people [on the jury] that [he] committed bank fraud and wire fraud." John at 1. John "could have spent" "the last two[] years" "in anger, despair[,] and feeling sorry for himself," and "[o]f course there remains, as there will always be[,] regret, some frustration[,] and anger that John [has been managing] well," John's dad thinks that "[t]his two[-]year period has been as beneficial as it could have been in the rehabilitative aspects for his future." Bill at 3.

For his part, John believes:

> The interesting thing about supporting people in my circumstance, I think one must choose to unconditionally support someone or not. The people in my life do not really know what happened and I have not been dealt a random illness of some kind. My choices and the results of them put me here. I was a drunk, a liar and my name and life is negatively impacting everyone related to me, who worked for me and was friends with me. I have been blessed that my family, some employees, and many friends have chosen to unconditionally support me. I have never experienced anything like their support or if I have, maybe I was too selfish to notice. A great many people have chosen to just move on to the next page in their story. I fully understand the choice.
>
> These days, I am working a few shifts a week from 2am to 10 am as a driver for a bakery in Providence, Rhode Island. I fill up a truck with what I am told needs to go out, I drop it off where and when I am told. At the end of my shift, the truck is empty and I clean it. Afterwards, I get to go see my kids, go exercise, go to a meeting for maintenance of my condition or to where I am staying. I haven't had a job where nothing went home with me mentally or emotionally in 25 years. I regret not understanding that this is all people want. They didn't sign up to make their jobs their lives. One of my delivery stops is the Brown University Engineering School where the recent random mass shooting occurred. At around 530 am, I typically walk in boxes of croissants, muffins to their café on the first floor. When I listen to the world, I am told that what is happening in my life matters but there are far more important things to get through.

> As far as time in prison, my children are dynamic, strong and have handled life on its terms in a fashion I cannot comprehend. My ex-wife Emma has been there for them, created a life for them that is secure and in which they can prosper. I am eternally thankful to her for that. I have tried my best to be there in whatever capacity I can and which they will have me. I fully intend to do that going forward. As far as everyone else in my life, I can now tell them I will be ok no matter what comes, they can really believe me and know I mean it. It isn't up to us to control. I do know that if Lauren didn't show up and put me in handcuffs two years ago, I wouldn't be here in the way I am today.
>
> [ . . . ]
>
> Today, my main job is not to drink. I hopefully won't tomorrow. If I don't, I know I get the chance to be authentic, to be useful to others, I get to do uncomfortable things my defects do not want me to do and I get to yield to outcomes I do not control. When I fall short, I get to try again the next day. I am grateful for the parts of my life I have kept, for all the new things in my life and all that is to come.
>
> Thank you again for your time. Best wishes to you and your family.

John at 3, 12.

## STANDARD

This Court must impose a sentence that is "sufficient, but not greater than necessary," to fulfill common law's traditional sentencing considerations: "retribution, deterrence, incapacitation, and rehabilitation." Tapia v. United States, 564 U.S. 319, 325 (2011); Kimbrough v. United States, 552 U.S. 85, 90 (2007); 18 U.S.C. § 3553(a).

Congress codified these factors in 18 U.S.C. § 3553(a), which directs the Court to consider, inter alia, "the nature and circumstances of the offense" and "the history and characteristics of [John]." 18 U.S.C. § 3553(a)(1). The sentence should also (a) "reflect the seriousness of the offense, [] promote respect for the law, and [] provide just punishment;" (b) adequate[ly] deter[] criminal conduct;" (c) "protect the public" from John; and (d) "provide [John] with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

Section 3553(a) further directs the Court to consider "any pertinent policy statement" issued by the United States Sentencing "**Commission**," "the need to avoid unwarranted sentence disparities," and restitution to victims. 18 U.S.C. § 3553(a)(5)–(7). In doing so, the Court should weigh "the kinds of sentences available" and consider the "**Guidelines**" promulgated by the Commission. 18 U.S.C. § 3553(a)(3), (4).

In creating the Commission and Guidelines framework, Congress recognized that a variety of factors might affect the appropriate sentence, including "the circumstances under which the offense was committed which mitigate or aggravate the seriousness of the offense" and "the nature and degree of the harm caused by the offense, including

whether it involved property, irreplaceable property, a person, a number of persons, or a breach of public trust." 28 U.S.C. § 994(c)(2), (3).

While the Court must begin its analysis by calculating John's Guidelines range, the Guidelines neither bind this Court nor are presumptively reasonable. Nelson v. United States, 555 U.S. 350, 351 (2009); Gall v. United States, 552 U.S. 38, 48–50 (2007).

Furthermore, even if the Guidelines point to prison, the Court must always consider all of "the kinds of sentences available," such as community service, probation, and house arrest. Gall, 552 U.S. at 59, 59 n.11. Despite the apparent conflict between the statutory and Guideline Provisions, in creating the Commission and authorizing the Guidelines, Congress stated that probation is the presumptive sentence for first-time offenders unless they are convicted of violent or otherwise serious felonies—and that probation is acceptable for **all** offenders except those "convicted of a violent crime that result[ed] in serious bodily injury." 28 U.S.C. § 994(j); see also Office of Probation and Pretrial Services, Administrative Office of the United States Courts, Pub. 107, The Presentence Investigation Report at V-5 (Mar. 2006) ("[Probation o]fficers should consider the appropriateness of any available alternatives **before** deciding to recommend a term of imprisonment.") (emphasis added).

## ARGUMENT

### I. The PSR Incorrectly Calculates the Offense Level, Guidelines Range, and Restitution

Probation has calculated that John's offense level is 30. PSR ¶ 111. With John's Criminal History of I, Probation calculates John's guideline imprisonment range as 97 to 121 months. Id. However, Probation's offense level calculation rests on a number of incorrect facts and conclusions. Therefore, John respectfully submits that the proper offense level either is eight or between 18 and 24, with a resulting Guidelines sentence of zero to six or 27 to 63 months.

First, Probation has concluded that John is responsible for a total loss of more than $25 million but less than $65 million, resulting in a 22-level enhancement. PSR ¶ 27. But the only way to land in that 22-level range is to include the investors' loss, which is unlawful because the Government introduced no evidence suggesting that John lied to them to "obtain" their money or property. See supra at 5.

Therefore, at very most, the proper amount of loss should be the approximately $18.2 million of EBCC's loan principal, which results in a loss enhancement of 20, not 22. See United States v. Pina, No. 18-CR-179-JSR, 2019 WL 1904920, at *3 (S.D.N.Y. Apr. 11, 2019) (Rakoff, J.) (rejecting Government's proposed loss amount as "entirely speculative" and insufficient for the court to "make a principled assessment" of the amount "properly attributable" to the defendants' scheme).

However, if the Court agrees that it is proper to calculate EBCC's loss not by the total amount of principal, but by the total amount that is the result of John's fraudulent

conduct, that loss amount drops even further, to either $443,007.14, which would result in a 14-level increase; or $3,935,844.21 or $8.965 million, either of which would result in a 18-level increase. Compare GX 3001–09, GX 3010A, GX 3010B, GX 3013C, GX 3015–16 with USSG 2B1.1(b)(1); see also, e.g., United States v. Rutkoske, 506 F.3d 170, 179–80 (2d Cir. 2007) (remanding where district court did not "at least approximate the amount of loss of the loss caused by the fraud without even considering other factors," since "[m]any factors may cause a decline in share price between the time of the fraud and the revelation of the fraud"); United States v. Ebbers, 458 F.3d 110, 128 (2d Cir. 2006) ("Losses from causes other than the fraud must be excluded from the loss calculation."); United States v. Olis, 429 F.3d 540, 548–49 (5th Cir. 2005) (quoting United States v. West Coast Aluminum Heat Treating Co., 265 F.3d 986, 991 (9th Cir. 2001)) (remanding securities fraud conviction for resentencing where district court "did not take into account the impact of extrinsic factors" on stock price decline; "District courts must take a 'realistic economic approach to determine what losses the defendant truly caused or intended to cause'").

Finally, since the evidence at trial suggests that all of EBCC's loss was caused by Covid-19 and other market factors—indeed, John caused Ebury to pay EBCC even more money than John stole, at the exact same time that he stole it—it even is possible to calculate the loss amount as $0. See, e.g., Rutkoske, 506 F.3d at 179 (remanding for recalculation of loss where district court accepted a loss estimate that failed to employ a methodology to separate fraud-related losses from market decline-related losses; "the loss must be the result of the fraud."); United States v. Tournant, No. 22 Cr. 276 (LTS),

Dkt. 177 (S.D.N.Y. Dec. 6, 2024) (Swain, J.) (Chief Judge Swin rejected Government's position that "loss" was measured by the full amount of investor funds obtained ($3.2 billion) and declined to apply a loss enhancement); United States v. Cuti, No. 08 Cr. 972(DAB), 2011 WL 3585988, at *4 (S.D.N.Y. July 29, 2011) (Batts, J.) (holding that the Government failed to meet its burden to establish § 2B1.1 loss for multiple reasons, including failing to explain impact of "other factors" on loss calculation, and declining to award restitution).

For the same reasons, John respectfully submits that Probation has incorrectly calculated John's mandatory restitution amount as $26,79,351.82. See United States v. Goodrich, 12 F.4th 219, 221 (2d Cir. 2021) (to obtain restitution, Government bears the burden of proving by a preponderance of the evidence the identity of each victim and each victim's actual loss).

Then, Probation has calculated that "[t]here are at least 11 identifiable victims in this case" by listing EBCC and ten separate alleged investor victims. PSR ¶ 28. If, as discussed above and below and at length in John's closing argument and Rule 29 briefing, the Court finds that the Government did not prove, by a preponderance of the evidence, that John lied to Ebury investors "to obtain" their money or property—since John and Ebury stopped soliciting, and investors stopped contributing, money to Ebury years before the first Disputed BBC—there is only one victim: EBCC. See United States v. Reifler, 446 F.3d 65, 136–37 (2d Cir. 2006) ("[P]ersons who were [not] buyers in reliance on a defendant's material misrepresentation / omission [ . . . ] but rather were persons

who simply held their stock until it became worthless" are not "victims" for purposes of sentencing).

But even if the investors do count as victims of this crime, there are not ten separate investor victims: there are seven. See PSR ¶ 28. Of the ten listed victims, four are simply different accounts owned by the same person: Wendy Erickson (and one of those accounts' restitution amount is just $911.12). Id. (listing "EFL Trust FBO Wendy Erickson," "Wendy Erickson – Traditional IRA," "Erickson Holding Corp.," and "Lelewer Foundation" as four separate "victims."); but see USSG § 2B1.1(1) ("'Victim' means[] any person who sustained any part of the actual loss determined under subsection (b)(1) [ . . . ] 'Person' includes individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies."). Therefore, even assuming that the investors are "victims" for purposes of the Guidelines calculation, the total number of victims is less than ten, there should be no two-point victim enhancement. See USSG § 2B1.1(b)(2).

Probation also erred by refusing to give John a two-level acceptance of responsibility adjustment. Although the Government argues that John cannot reap the benefit of that adjustment because he insisted on his right to trial, that simply is not the law. See generally USSG § 3E1.1(b); cf. United States v. Tavberidze, 769 F. Supp. 3d 264, 270 (S.D.N.Y. 2025) (Rakoff, J.) (holding that USSG § 3E1.1(b) "violates the Sixth Amendment right to trial" by "effectively penaliz[ing] a defendant who, whether innocent or guilty, proceeds to trial," "arguably [ . . . ] as a reward for a defendant's demonstrating genuine remorse," and because "sav[ing] the Government from having to

prepare for trial [ . . . ] cannot possibly be an adequate ground for penalizing a defendant for the exercise of a constitutional right.").

## II. Probation's Recommendation of an Eight-Plus Year Sentence Pursuant to Section 3553(a) Appears to be Based on Incorrect Facts and Unsupported Assumptions

Probation appears to rest its conclusion that "Hanratty has not exhibited little to suggest that he accepts responsibility for his criminal conduct" and its concomitant recommendation that the Court imprison John for 97 months—over eight years—on assumptions that Probation does not support with facts, including Probation's feeling of "[John's] unlikely self-motivation to make restitution." See PSR at 48; but see id. ¶ 127 (Probation "has identified factors that may warrant a sentence outside of the sentencing advisory range. The defendant is a first-time convicted felon who began his involvement in the non-violent offense at age 42.").

For example, Probation never explains why the mere fact that John's finances have materially changed since his December 2023 arrest and August 2025 conviction must mean that John told the truth about his finances when he first was arrested, but is lying now. See generally id.; but cf. United States v. Coppola, 671 F.3d 220, 249 (2d Cir. 2012) ("In determining a loss amount for purposes of Guidelines calculation, a district court's findings must be grounded in the evidence and not derive from mere speculation.").

Moreover, Probation's claims that John "has made no omission [sic], to date, of his intent to make his victims whole," see PSR at 47, is just plain false: as John and undersigned counsel raised with Probation both during John's pre-sentence interview and in written submissions responding to the draft PSR, John signed a term sheet for a

payment plan volunteered extra collateral and personal liability, participated fully in the Commercial Division case, and paid EBCC millions even during his alleged fraud, while on the investor side, John repaid investors millions of dollars, including dozens of investors who never complained to the Government or otherwise participated in this criminal case. And, of course, the entire theory of the Government's case was that John's only motivation for stealing from EBCC was to make Ebury's investors whole.

Probation's purported "concerns regarding [John's] potential conduct while serving any imposed of supervised release" and "questions [regarding John's] genuineness to the presentence investigation process pertaining to his financial disclosure" are similarly unwarranted. Id. at 48. For example, Probation notes that Mr. Hanratty's "initial financial affidavit [ . . . ] was undated and unsigned," but not that Mr. Hanratty corrected that submission with a signed and dated affidavit. Id.

Probation also complains that the initial affidavit "listed no financial accounts (personal or business), motor vehicles, or real estate properties," even though that information is entirely consistent with what John reported during his presentence interview, and has reported for nearly two years: as is not atypical for a federal criminal defendant, particularly one accused of bank fraud and money laundering, all his banks shut all his accounts, he and his wife sold their cars for much-needed cash after the Government obtained the PIRO, and had rented their Puerto Rico residence; that is why the residences that secure John's bond are those of his parents and brother. Compare id. with id. ¶ 99 ("In December 2023, [John] also reported to the pretrial services office that he maintained two personal checking accounts[] and owned three motor vehicles,

including a 2018 Toyota 4-Runner, a 2017 Ford Explorer, and a 2012 Jeep Wrangler. These asset were not reflected in the defendant's financial affidavit to the probation office. Upon further inquiry, [John] stated that the checking accounts were 'shutdown' as a result of the instant case, and the 2018 Toyota 4-Runner and 2017 Ford Explorer were sold. He added that the 2012 Jeep Wrangler 'belongs' to his daughter[].").

Probation also questions the truthfulness of John saying that he pays his monthly expenses with cash because "cash is not a form of payment processed by Airbnb," even though John told Probation that he uses his father's credit card when he cannot pay in cash, and that after initially finding his Rhode Island room on Airbnb, he has been renting directly from the owner. See id.

Probation did not accept a single one of the objections that the defense lodged to the draft PSR and provided no explanation of its refusals except repeating that it "concurs with the Government." Id. at 33–45; but see United States v. Rainford, 110 F.4th 455, 476 (2d Cir. 2024) ("[A]doption of the PSR does not suffice if the PSR itself does not state enough facts to permit meaningful appellate review."). Probation requested, and the defense consented, to several extensions of time to prepare the final PSR to accommodate late-arriving victim impact statements.

## III. A Six-Month Sentence Would Reflect the Courts' and Sentencing Commission's Evolving Understanding of How to Punish Fraud

For decades, Second Circuit courts have expressed concern that the Guidelines' approach to economic crime sentencing is arbitrary and unjustifiable. See, e.g., United States v. Corsey, 723 F.3d 366, 378, 380 (2d Cir. 2013) (Underhill, J., concurring) ("[T]he

loss guideline is broken," and "fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guidelines advice to sentencing judges;" the Guidelines leave judges "without meaningful guidance in high-loss cases"); United States v. Thompson, 19 Cr. 698 (ER), Sentencing Tr. at 28:25–29:7 (S.D.N.Y. Feb. 4, 2021), (Ramos, J.) ("[P]erhaps the fraud guidelines put entirely too much emphasis on the amount of the fraud, the money that's involved in the fraud. [ . . . ] I take the point that the amount of money does not necessarily get at the crux of the conduct that we are trying to prevent."); United States v. Johnson, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (Garaufis, J.) ("[T]he Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment best first the crime, nor any approximation of the moral seriousness of the crime."); United States v. Park, No. 16-cr-473(RA), Dkt. 44 at 47 (S.D.N.Y. Aug. 1, 2017) (Abrams, J.) (in fraud sentencing involving tens of millions of dollars, noting that "in many instances, loss amount on [its] own is an imprecise and imperfect measure of culpability.") United States v. Faibish, No. 12-cr-265 (ENV), 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) (Vitaliano, J.) (the Guidelines lead to "[m]indless acceleration" of a sentence); United States v. Gupta, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (Rakoff, J.), aff'd, 747 F.3d 111 (2d Cir. 2014) ("[T]he numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice."); United States v. Parris, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (Block, J.) ("[T]he Sentencing Guidelines for white-collar crimes are a black stain on common

sense"); United States v. Adelson, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (Rakoff J.), aff'd, 301 F. App'x 93 (2d Cir. 2008) (the Guidelines place "inordinate emphasis [ . . . ] on the amount of actual or intended financial loss" yet do not "explain[] why it is appropriate to accord such huge weight to such factors."); United States v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) ("The [G]uidelines place undue weight on the amount of loss involved in the fraud," which "is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence.").

By 2016, the Second Circuit recognized that "the amount of the loss [has] become the principal determinant of the adjusted offense level and hence the corresponding sentencing range," but criticized "[t]his approach, [which is] unknown to other sentencing commissions," and remarked that "its unusualness is a circumstances that a sentencing court is entitled to consider." United States v. Algahaim, 842 F.3d 796, 800 (2d Cir. 2016). Therefore, the Second Circuit has approved of district courts issuing below-Guidelines sentences after analyzing how "adjusted offense level[s] driven by the monetary loss amount" compare with "a rather low base offense level." Id.

Now, the Commission has released its preliminary proposed amendments to the Guidelines, including long-awaited proposed reforms to the economic crimes table. See generally United States Sentencing Commission, Proposed Amendments to the Sentencing Guidelines (Preliminary) (Dec. 12, 2025) ("**Proposed Amendments**"). For the first time in decades, the Proposed Amendments finally adjust the loss table for inflation, and have responded to concerns about simplifying the table by reducing the number of levels. Id. at PDF 46, 59.

More holistically, the Commission is proposing amendments to address the criticism that § 2B1.1 "does not appropriately reflect the culpability of sentenced individuals or harm experienced by the victim" and does not at all consider "non-economic harm," such as "physical harm, psychological harm, emotional trauma, harm to reputation or credit rating, and invasion of privacy." Id. at 62.

The Commission also proposes adding "mitigating factors." Id. The first would provide for a two-level decrease "if the defendant committed the offense at the direction of his or her employer for fear of negative employment consequences; was motivated by an intimate or familial relationship or by threats or fear to commit the offense and was otherwise unlikely to commit such an offense; or was unusually vulnerable to being persuaded or induced to commit the offense due to a physical or mental commission." Id.; see also id. at 79 (this proposed amendment intended to address situations when "the individual committed the offense under coercion or duress").

The second "would provide for a tiered decrease [of up to six levels] based on whether, prior to the defendant's knowledge of the criminal investigation or prosecution for the offense, the defendant voluntarily ceased the criminal activity, made efforts to return the money or property to the victim, or reported the offense to the appropriate governmental authorities." Id. at 62–63, 67–68; see also id. at 79 (this proposed amendment intended to reward a defendant who "took certain actions prior to the defendant's knowledge of the criminal investigation or prosecution of the offense.").

The Commission also is considering an additional, separate amendment "that would provide a reduction at a newly created § 3E1.2 (Post-Offense Rehabilitation) based

on a defendant's positive post-offense behavior or rehabilitative efforts," specifically in response to criticism that the current "Acceptance of Responsibility" and "Substantial Assistance to Authorities" adjustments do not "provide appropriate adjustments for good behavior" and "do not sufficiently incentivize or reward positive post-offense conduct and rehabilitative efforts taken by defendants prior to sentencing." Id. at 79, 81. That amendment would likely include a defendant's efforts not only for his "own rehabilitation," but also toward "victim(s) of the offense, community, or other people." Id. at 81. Depending on which and how many of these characteristics the defendant satisfied, the amendment would allow for as much as a four-level decrease. Id. at 82–83.

While not even enacted Guidelines bind this Court, these proposed amendments do provide a sentencing framework that is much more aligned with § 3553 than the current Guidelines do. Cf. Pepper v. United States, 562 U.S. 476, 488 (2011) (citing Wasman v. United States, 468 U.S. 559, 564 (1984)) ("Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'").

First, not even the investor victims have claimed that John caused them non-economic harm. See generally PSR. Most of them declined to provide victim statements, and fortunately, all of the investor victims appear to have had such significant assets that they do not claim that their Ebury losses have harmed their lifestyles, savings, or retirements, although Mr. Erickson says that the failed Ebury investment has caused "[his] family to lose almost all faith in [his] investment abilities" and "impacted [his]

relationships" with "friends" he "encouraged" to invest (but appear not to have actually invested) in Ebury. See PSR ¶¶ 30–32.

Moreover, John's circumstances demonstrate almost every single one of the mitigating factors that the Commission is proposing. As far as the offense conduct itself is concerned, the Government always alleged that John was motivated not by greed or financial gain, but instead wanted to please and was afraid of his investors—for a small fund like Ebury, essentially John's employers (and some his literal former employers)—who also physically threatened his wife and Ebury's controller, besides their litigation threats.

Furthermore, years before learning there was a criminal investigation, John "voluntarily ceased the criminal activity" and "made efforts to return the money or property to the victim:" he never requested to borrow money after January 2020, pledged millions more in collateral and personal guaranties long after Ebury stopped borrowing money, executed the September 2022 term sheet in which he pledged his own personal liability and committed to a repayment plan, and even fully participated in the civil case, never once invoking his Fifth Amendment rights.

Particularly since his December 2023 arrest, John also has exhibited strong "post-offense behavior [and] rehabilitative efforts." Despite Probation's distrust of John's post-conviction representations about his current financial state, Probation also acknowledges that John "has kept all court appearances," "has generally been in compliance with the terms and conditions of his release" (and does not identify any times when John was not

in compliance," and "is not viewed as a flight risk or a danger to the community." PSR at 54.

John's voluntary, self-directed rehabilitation has gone far beyond the bare minimum of complying with bond conditions. Almost immediately after he was arrested, John began seeing a therapist. Even though he initially would drink even during their morning therapy sessions, to this day, John has continued to show up for his regular, frequent therapy sessions. See generally Julia Humphries at 1. His therapist "has found him to be a thoughtful, kind and compassionate man" and a "willing and proactive participant [in therapy] for the last [two] years," even though "his inability to work[] these past [two] years[] has been difficult for everyone," particularly since he "ha[d] always been an excellent and generous provider for his family of five." Id. His therapist believes that this criminal case "has opened John's eyes to a richer way of living life." Id. at 2.

Dealing with Ebury's implosion and this criminal case also caused John to not only check himself into rehab, but also move in and have his sobriety supervised by his elderly parents. So far, so good: John has been sober for nearly 18 months.

But at least to undersigned counsel, perhaps the most unusual aspect of John's post-arrest development has been his persistence in caring for his family through very different work than the white-collar professions like law, compliance, and finance, where he had spent his entire adult career. Ebury's failure and this criminal case have decimated John's ability to find work in his chosen professions.

Instead of resigning himself to unemployment or resentment, John has embraced caregiving and other manual work, from taking care of his uncle and father and children to working construction and driving a bread truck. He is not a defendant who is blaming everybody else for his problems, or wasting weeks ruing his bad luck for getting caught. He does not think he is too good to start all over again. And he will do anything he can to help his family, and is not daunted by doing unglamorous and disrespected work like elder care or manual labor.

## IV. Six Months of Incarceration is "Sufficient[] but Not Greater than Necessary" to Serve the Congressionally-Mandated Purposes of Sentencing

Finally, a six-month sentence would serve sentencing's deterrence, punitive, and rehabilitation purposes, and would be consistent with federal law and sentences handed down to similarly-situated defendants.

No incarceration at all is necessary for specific deterrence or punitive purposes. John has lost his wife, his business, his savings, his reputation, and his social life, and is set to lose his bar licenses. Even if the Court imposed no financial penalties in connection with this criminal case, John is set to face personal judgments for tens of millions of dollars to EBCC in the Commercial Division—where John had admitted breach-of-contract liability in his very first filings in October 2022—and no longer has funds to fight any other litigations, including the Puerto Rico and Delaware federal cases in which he and Ebury sued Tom McOsker for over $3.5 million for stealing Ebury's license. He has consistently regretted how his misconduct has hurt not just his family, but also EBCC—particularly Jack Grady and Karen Wold—and Ebury's investors.

In other words, even without prison time, there are countless ways in which John and his community have punished him, and therefore countless reasons why John will never break the law again. See United States v. Stewart, 590 F.3d 93, 141 (2d Cir. 2009) (sentencing court properly considered that the conviction itself already visit[ed] substantial punishment" on defendant by likely barring him from future work in his profession).

Although there still is not much data on general deterrence, what research that does exist is clear that "the certainty of being caught is vastly more powerful deterrent than the punishment." Department of Justice National Institute of Justice, Five Things About Deterrence (June 5, 2016) ("**Five Things**") ; but see Ellen Chayet, Elin Waring, and David Weisburd, Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, National Criminal Justice Reference Service (Nov. 21, 1994) (a study of sanctions on criminal careers of 742 offenders convicted of white-collar crimes in seven U.S. district courts between fiscal years 1976 and 1978 found that prison did not have a specific deterrent impact on the likelihood of rearrest over a 126-month follow-up period).

The DOJ's own National Institute of Justice "summarizes a large body of research" to observe that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime;" "prison sentences (particularly long sentences) are unlikely to deter future crime;" and "[l]aws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes." Five Things.

A six-month sentence also would be consistent with how Second Circuit courts actually sentence criminal defendants. In 2023, the federal median sentence for fraud cases was 12 months, while the Southern District median was 13 months; the higher SDNY number likely reflects that Manhattan is the center of the financial world and tends to see more white-collar prosecutions for higher loss amounts. United States Sentencing Commission, SDNY Statistical Information Packet at 11 (FY 2023) ("**SDNY Sentencing Statistics**").

However, while 67% of national sentences were within the Guideline Range, in the Southern District only 34.5% were—and only two percent were above, leaving **63.5% of SDNY sentences below the Guidelines Range**. Id. at 12. Meanwhile, the Second Circuit more broadly has even more sentences below the Guidelines Range: 69.1%. Id. at 13.

John merits less incarceration time than even the typical SDNY fraud defendant because he did not commit the typical fraud crime. Investors—in Ebury's context, functionally John's bosses—threatened him legally and threatened his wife and Ebury's controller physically. John stole from EBCC only to pay his other fraud victims, not himself. At no times did he demonstrate greed or pursue a lavish lifestyle: he, his wife, and his teenage daughter drove a 2018 Toyota 4-Runner, a 2017 Ford Explorer, and a 2012 Jeep Wrangler, and neither he nor his wife even owned real estate by 2023. The SEC never even pursued the investigation that it opened after receiving investor complaints in 2019. And while the Government repeatedly argued that John engaged in a "Ponzi-like scheme," unlike with an actual Ponzi scheme, Ebury was a real business, with real

assets and liabilities, real operations, real management, and real prospects. Cf. Balaber-Strauss v. Lawrence, 264 B.R. 303, 305 (S.D.N.Y. 2001) (Hardin, B.J.) ("A Ponzi scheme is an investment scheme which is not supported by a legitimate underlying business venture.").

Finally, a six-month sentence would be consistent with the Second Circuit's suggestion that district courts consider sentences that match a "rather low base offense level" where the Guidelines calculation is driven by a high loss amount. See Algahaim, 842 F.3d at 800. Because the jury convicted John of bank fraud and only because of the bank fraud conviction, John is statutorily ineligible for probation. PSR ¶ 116.

However, John's base offense level is seven; even with the automatic one-point adjustment for his § 1957 convictions, it would become just eight. PSR ¶¶ 37–46. Even without the automatic Zero-Point Offender two-level decrease, John's lack of criminal history, plus an offense level of eight, would result in a Guidelines Range of zero to six months.

## CONCLUSION

Because John is a first-time offender who committed his crimes under duress and already has suffered and will continue to suffer life-altering consequences that are enough to deter any similarly-situated potential fraudster from breaking the law, six months' incarceration, plus restitution and / or forfeiture as the Court finds necessary to compensate victims' actual fraud losses and disgorge any criminal proceeds, is the "just punishment" for John's crimes.

Dated: December 22, 2025
New York, New York

Respectfully submitted,

**GUSRAE KAPLAN NUSBAUM PLLC**

/s/ Kari Parks
Kari Parks
120 Wall Street, 25th Floor
New York, New York 10005
(212) 269-1400
kparks@gusraekaplan.com

*Counsel for Defendant John Arthur Hanratty*