UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| *-v.-* | : | S1 24 Cr. 153 (LGS) |
| JOHN ARTHUR HANRATTY, | : | |
| Defendant. | : | |

-------------------------------------------------------------x

**THE GOVERNMENT'S SENTENCING MEMORANDUM**


SEAN S. BUCKLEY
Attorney for the United States
*Acting Under Authority Conferred*
*By 28 U.S.C. § 515*

Danielle Kudla
Adam Sowlati
Assistant United States Attorneys
Southern District of New York
- *Of Counsel* -

The Government respectfully submits this memorandum in advance of the sentencing of John Arthur Hanratty, presently scheduled for January 20, 2026, and in response to the defendant's sentencing memorandum, dated December 22, 2025 ("Def. Mem.").

## PRELIMINARY STATEMENT

John Arthur Hanratty was convicted of orchestrating a years-long fraud scheme, which stole tens of millions of dollars from his investors and lender, Emigrant Business Credit Corporation ("EBC"), a wholly owned subsidiary of Emigrant Bank (collectively, "Emigrant"). Over the course of nearly five years, the defendant engaged in a campaign of deception. When investor redemption requests started to roll in, Hanratty told his investors—many of whom were his former colleagues and friends—that he was winding down his firm, Ebury Street Capital ("Ebury"), and liquidating its assets. Behind their backs, however, Hanratty was lying to Emigrant, requesting millions of dollars in cash advances to stave off further redemption requests. Throughout, Hanratty falsely told his investors and Emigrant that Ebury's assets were protected by an independent third-party custodian when they were not. Even now, as he stands to be sentenced, Hanratty has taken no responsibility for his actions, repeatedly minimizing and downplaying his crimes. As he did at trial, Hanratty continues to blame others—arguing that Thomas McOsker stole from him, Ebury investors accepted the risk that they could lose their investment capital, and that the pandemic prevented him from making Emigrant whole. After a more than two-week trial, the jury rejected these arguments. Put simply, this multi-million fraud could not have occurred but for Hanratty's decision to lie time and time again.

Hanratty was given every advantage in life—a law degree, a lucrative job in finance, supportive colleagues, and a family. When faced with economic challenges, Hanratty did not choose honesty, he chose fraud. Make no mistake: the defendant was motivated by greed. He

used Emigrant's money to maintain his lifestyle and keep angry investors at bay. As a result of his lies, the defendant's investors lost millions of dollars and Emigrant lost nearly $20 million and was forced to close EBC as a line of business, resulting in the loss of jobs for Emigrant employees.

Unlike so many defendants, there are no persuasive mitigating factors to explain the defendant's crimes. He did not act because of passion or impulse, or a momentary lapse of judgment. His fraud continued for years, as Hanratty repeatedly took advantage of victims who trusted him. The fact that the victims were sophisticated business partners does not change the fact that they relied on the defendant's representations that he was telling the truth.

The defendant's conduct was intentional, calculating, and deceptive. He was the mastermind of the lies to Emigrant and investors. He knew that he did not actually own the tax liens, and that his overall tax lien portfolio was vastly overvalued. He knew that he did not have the money to payback investors and Emigrant. And, by 2021, when Emigrant started to ask questions, Hanratty continued to lie—evening forging documents to conceal his fraud.

Based on the duration and nature of Hanratty's crimes, the resulting harm that he has caused, his refusal to accept responsibility for his criminal actions, and the need to dissuade others from committing similar crimes, justice warrants a meaningful sentence of at least 72 months' imprisonment.

## BACKGROUND

On August 4, 2025, following a two-week long trial, the defendant was convicted of four counts: wire fraud on Emigrant and Ebury investors; bank fraud on Emigrant; and two counts of unlawful monetary transfers. Although the Court is familiar with the facts underlying those convictions, having presided over the trial, the defendant's criminal conduct is described below.

These facts make the following clear about the defendant's criminal conduct: (i) the defendant was the founder, manager, and ultimate decision maker for Ebury; (ii) the defendant used Ebury as part of the fraud scheme to benefit and protect himself; (iii) the defendant relied on the complex nature of his tax lien investment portfolio to conceal his fraud scheme for years; (iv) the defendant's fraud resulted in millions of dollars of financial losses; and (v) the defendant has failed to take responsibility.

## I. <u>The Offense Conduct</u>

### a. Background on Ebury and Its Lending Relationships

Hanratty founded Ebury, a tax lien investment firm, in 2013. (Presentence Investigation Report ("PSR") ¶10). Prior to founding Ebury, Hanratty served as the Chief Compliance Officer at OTA LLC ("OTA"), a registered broker-dealer and privately held hedge fund in Purchase, New York. (PSR ¶10). In search of investors, Hanratty turned to many of his OTA colleagues, including Ira Leventhal, the founder of OTA and Hanratty's then-boss. Leventhal, along with his wife, invested more than $10 million, becoming Hanratty's first and largest Ebury investor. (PSR ¶16). Over time, additional OTA colleagues invested money in Ebury, including, among others, James Santori and Stephan Skinner. (PSR ¶16). Between 2013 and 2016, Ebury's tax lien portfolio performed well as Hanratty obtained additional capital, including through equity investors like Leventhal, Santori, and Skinner and debt lenders like Capital One.

Hanratty marketed Ebury to equity investors as a safe and stable investment fund that primarily invested in municipal tax liens, which are liens placed on real property by municipal governments for delinquent property taxes. (PSR ¶30). Municipal governments typically sell these tax liens in the form of tax lien certificates to the highest bidder at public auctions. Investors, like Hanratty, purchase tax lien certificates because: (1) municipal tax liens earn an attractive rate of interest until the underlying taxes are repaid—"redeemed"—by the property owner; (2) tax liens

are expected to be redeemed because most people want to remain in their homes; and (3) to the extent the tax lien is not redeemed, the tax lien certificate holder typically has the right to foreclose on the property and obtain value from the underlying real estate. (Tr. 100). Apart from purchasing tax lien certificates directly from the municipality, investors, like Hanratty, can also purchase tax lien certificates on the secondary market, often through brokers. (Tr. 965).

In the materials that Hanratty distributed to investors, Hanratty represented, among other things, that he was (i) the sole investment manager of the Ebury portfolio, (ii) the investment decision-maker, and (iii) that Ebury's tax lien assets were managed by a custodian—an independent third-party custodian—whose responsibility was to verify Ebury's purported ownership of the tax liens. (DX560, 2149A).

In 2016, Hanratty turned to EBC to retire Ebury's outstanding debt with Capital One and further expand Ebury's tax lien portfolio. Prior to entering into a lending agreement, Emigrant conducted a lengthy due diligence process, which included, among other things, a field examination (*i.e.*, an onsite audit of Ebury's books and records). As part of the initial due diligence process, Sound Shore Financial, LLC ("Sound Shore") prepared a field examination report that found, among other things, that (i) Ebury's books, records and internal controls were in satisfactory condition, (ii) Ebury, through Hanratty, the firm's managing director, had provided Sound Shore with the requested information needed to complete the field examination, and (iii) that Ebury's assets and loan positions were monitored on a monthly basis through a borrowing base certificate. (Tr. 723; GX3230). As part of its lending recommendation, Sound Shore stated that Ebury's continued use of a third-party custodian and servicer was essential to maintaining records, controls, and the efficient collection of collateral. (GX3230).

In accordance with this recommendation, Emigrant required Ebury to maintain a third-party custodian and servicer. Under the lending agreement, Ebury could not change its custodian or servicer without Emigrant's *written* approval and authorization. (GX3019). Moreover, EBC's leadership relied on Hanratty's promise to use a custodian-servicer when seeking final lending approval from Howard Milstein, the chairman of Emigrant. (GX3047). On March 2, 2017, Karen Wold, an EBC managing director, wrote to Milstein, noting that the risk of "fraud" was "low given the fact the tax lien certificates" were generated by "municipal tax jurisdictions" and "[t]he servicers—not Ebury—receives the tax lien certificates (and all payments) directly from the municipalities and verifies their authenticity." (GX3047). In response, Milstein, responded, "ok to proceed," granting EBC the authorization to enter into a multi-million-dollar lending agreement with Ebury. (GX3047).

On March 9, 2017, on behalf of Ebury, Hanratty executed two separate, yet nearly identical, credit agreements (the "Credit Agreements") with EBC for a revolving line of credit. Pursuant to the Credit Agreements, and their amendments, Hanratty was permitted to borrow up to $20 million on behalf of Ebury to purchase new tax liens and/or manage Ebury's existing tax lien business. (GX3019). The money lent to Ebury was provided by Emigrant Bank, which held custody of EBC's deposits in an Emigrant Bank account. (GX3019). Under the Credit Agreements, the line of credit was secured by the tax liens that Ebury had pledged as collateral, and any assets arising from those liens (*e.g.*, foreclosed property). (GX3019). As Emigrant witnesses testified at trial, Ebury's ownership of the tax liens pledged as collateral was paramount to the lending relationship. (Tr. 96, 1578). If Ebury were to default, EBC had the ability to collect the pledged collateral—the tax lien certificates. (GX3019). But the tax liens were *only* valuable to EBC if Ebury actually owned them.

Accordingly, the amount of money that Ebury was permitted to borrow was based on the value of the tax liens pledged as collateral. Pursuant to the Credit Agreements, each time Ebury wanted to borrow money, the defendant was required to submit the following materials: (a) a notice of borrowing, certifying that the defendant was in compliance with the terms of the Credit Agreement (including that Ebury owned the tax liens it was pledging as collateral, was using an independent third-party custodian-servicer to manage the collateral, and that the cash advances were only being used to purchase new tax liens or fund Ebury's business operations); (b) a collateral report, certifying the value of the tax liens pledged as collateral to EBC; and (c) a borrowing base spreadsheet, containing the underlying data for the tax liens pledged as collateral (collectively, the "borrowing base materials"). (GX3019).

**b. Hanratty Faces Pressure from Investors and Turns to Fraud**

In January 2018, after months of increasing frustration with Hanratty's investment strategy and fund management, Leventhal, the defendant's single largest investor, requested full redemption of more than $10 million of Ebury investment capital. Leventhal told Hanratty that he wanted his investment returned "sooner rather than later." (GX3118). In the following months, other Ebury investors, including, Michael Erickson, James Santori, Stephan Skinner, and Michael Salerno began voicing concerns regarding Ebury's financial stability and requested the return of their investment capital, with Ebury's portfolio no longer generating the 8-9% returns that Hanratty had touted in marketing materials. (GX2149A, GX2127-31). Over the course of 2018, Hanratty grew increasingly unresponsive to investors. (Tr. 599, 606-7, 618, 662-70). In the face of this silence, investors began to panic, increasing their demands for the return of their investment capital.

On October 9, 2018, when Hanratty failed to return Salerno's investment capital as promised, Salerno showed up at Ebury's Rye, New York, office and refused to leave until he was paid. (Tr. 997-99). By then, Hanratty had relocated to Puerto Rico, but Ping Xie, Ebury's chief financial officer, was present. (Tr. 997-99). The defendant instructed Xie to cut checks to Salerno. (Tr. 997-99). Salerno cashed the checks but they did not clear because of insufficient funds in the account. (Tr. 999-1000). Salerno then filed a police report alleging fraud and, shortly thereafter, sued Hanratty. (GX2164C, 401).

Recognizing he did not have the cash needed to pay back investors, Hanratty turned to his only source of immediate liquidity—Emigrant, his lender. He repeatedly turned to fraud. Hanratty took tax lien "for-sale" lists that he had received from brokers and then falsely represented to Emigrant that Ebury had purchased the tax liens on those lists. To execute the fraud, Hanratty had to lie to multiple people. First, he lied to his Ebury employees. He lied to Xie, the Ebury CFO, and Franklin Gandol, another Ebury employee, who would follow Hanratty's instructions when preparing the borrowing base materials. Second, Hanratty lied to Emigrant when he certified the accuracy of the borrowing base materials, promising that Ebury owned tax liens that it did not.

On eight different occasions—all pre-COVID—from October 15, 2018, through January 9, 2020, Ebury submitted lists of hundreds of tax liens in New Jersey and Florida that Ebury did not own. (GX1101-1111; GX3001, 03, 05, 07, 09, 10, 16, and their subparts)). At trial, a witness for the Government sampled 437 tax liens that the defendant claimed that Ebury owned; Ebury only owned eight. (GX502). As a result of these lies, the defendant obtained millions of dollars from Emigrant. (PSR ¶19).

The defendant's lies were not the result of negligence or happenstance—they were deliberate and willful. To take just one example:

- On November 8, 2018, Salerno's wife sent Hanratty a threatening a letter threatening litigation unless Ebury returned their investment capital. (GX2164B).
- On November 9, 2018, desperate for cash to pay Salerno, Hanratty requested a for-sale list from a tax lien broker. Hanratty begged the broker to "send [the list] sooner [rather] than later." (GX3212).
- Within a few hours of receiving the for-sale list from the tax lien broker, Hanratty emailed Emigrant stating that he would be submitting borrowing base materials shortly. (GX3005).
- Later that day, Hanratty did just that, submitting borrowing base materials that included the for-sale list liens that he had received from the broker. (GX504, 3005 and subparts, 3006-11.9.2018). The defendant never purchased these liens but relied upon their purported value to request a cash advance of $220,000 from Emigrant.
- Within hours of receiving the $220,000, Hanratty sent the money to Salerno's wife—in violation of his representation to Emigrant that the money would be used only to buy new tax liens or fund business operations. (GX501).

The November 9 cash advance is illustrative—just one example of the defendant lying about his ownership of tax liens. At no point did the defendant ever tell Emigrant that he intended to use the bank's money to pay off equity investors. (GX3001, 03, 05, 07, 09, 10, 16, and their subparts, Tr. 352-53). Had the defendant done so, Emigrant would not have advanced the defendant money. (Tr. 353-354). As Arora testified, Emigrant was in the business of lending money to ensure that its borrower was growing. If the borrower intended to sell of its assets through liquidation, "it's not going to be a business going forward, therefore [Emigrant] will not be lending any money to them." (Tr. 354).

Xie, the defendant's own employee, provided an insider's view of the fraud. Beginning in 2018, the defendant repeatedly promised Ebury investors that he would return their investment capital even though it was readily apparent to Xie—and certainly Hanratty as the owner of Ebury—that the firm did not have the money. (Tr. 1451-53). During this time, Xie noticed that Ebury began to self-custody and self-service an ever-increasing portion of if its tax lien portfolio. (Tr. 1451-53). Xie explained the defendant would repeatedly claim that Ebury had purchased new tax liens, but there were no corresponding bank records or ownership receipts. (Tr. 1451-53). Unbeknownst to Xie, there were no corresponding records because more often than not the defendant had not purchased the tax liens. (Tr. 1451-53).

In addition to falsely inflating the value of Ebury's tax lien portfolio, Hanratty also secretly stopped using MTAG as Ebury's third-party custodian and servicer. Hanratty's failure to maintain an independent custodian-servicer—a material representation to both Emigrant and Ebury investors—was essential to the success of Hanratty's fraud scheme. (PSR ¶20). In 2017, the defendant, with Emigrant's knowledge and written authorization, retained MTAG to serve as Ebury's custodian and servicer. (GX 2003, 2004, 3054). Within months, however, Ebury began self-custodying and self-servicing portions of his tax lien portfolio without Emigrant's and Ebury investors' knowledge or consent. (PSR ¶20). By May 2020, Ebury was self-custodying and self-servicing nearly 90% of the tax liens the defendant had pledged as collateral to Emigrant. (GX504). Both Santori and Erickson testified that, had they known Ebury was self-custodying the firm's assets, they would have withdrawn their money immediately. (Tr. 586, 666). Had Emigrant known the truth, the bank would not have advanced Ebury any money and would have called the loan. (PSR ¶20). The point of maintaining an independent third-party to serve as a custodian and servicer was to prevent the very fraud the defendant perpetrated. (Tr. 585-86).

**c. Hanratty Covers Up the Fraud**

By the end of 2020, the defendant's fraud scheme had come to a head. After lying to Emigrant between 2018 and 2019 to obtain fast cash to pay off investors, the defendant found himself in an increasingly precarious position. Whatever hope he may have harbored for his fraud scheme to go undetected was dashed by COVID-19 and the impact of the pandemic on the housing market. Hanratty's gamble that Ebury's portfolio would increase in value, allowing him to conceal his lies, failed. The defendant knew that he did not have the money to repay Emigrant and would need to extend the maturity date of the Credit Agreements. To do so, Emigrant required that the defendant provide audited financials for at least fiscal year 2019 and updated borrowing base materials *and* submit to another field examination that would compare Ebury's books and records to the representations made in the borrowing base materials. (Tr. 362). Each of these requirements, however, had the potential to reveal the defendant's fraud.

Rather than coming clean and telling the truth, the defendant doubled down and lied to cover his tracks. On December 15, 2020, Sound Shore, on behalf of Emigrant, emailed Hanratty, informing him that Sound Shore needed an updated borrowing base, which they would use to make randomized selections for the field audit. (GX3111). But by December 2020, nearly 25% of Ebury's tax lien collateral was based on fake tax liens. (*See* GX 3107 and 3107A and 3107B (May 18, 2020 borrowing base spreadsheets, containing the value of the fake liens in Ebury Fund 1 and 2 divided by the total acquisition price of the eligible liens in line 7)). Recognizing that nearly one out of every four liens pledged to Emigrant did not exist, the defendant took elaborate steps to cover his tracks.

*First*, on February 18, 2021, Hanratty belatedly submitted an updated borrowing base that stripped out the fake liens to ensure that they were not randomly selected by Sound Shore as part

of the field audit. (GX 3109 and 3109A). As a result, the January 2021 borrowing base contained an unexplained $17 million shortfall. (GX3187). As Arora testified, Hanratty never disclosed that the mysterious shortfall was a result of the removal of fake tax liens that Ebury pledged in 2018 and 2019 but never owned. (Tr. 347-48). Rather than admit his wrongdoing, Hanratty had simply removed the data tabs containing the fake liens and "hard coded" the mathematical formulas to make sure that Emigrant could not trace the fraud. (Tr. 375, 3109, and 3109A (January 31, 2021 borrowing base spreadsheet, showing that Hanratty was the both the author of the document and last person to modify the document)).

*Second*, Hanratty never provided Sound Shore with the material needed to complete its field audit. (Tr. 741-52). Instead, Hanratty falsely claimed that any delay was a result of an "uploading" issue between Ebury's files and MTAG's files. (Tr. 744, 1611). In reality, there never was an "uploading" issue—without Emigrant's and/or Ebury investors' knowledge or consent, Hanratty had simply stopped using MTAG to custody and service its tax lien portfolio. (GX 504).

Through 2021, Emigrant's frustration, concern, and panic grew. Although Emigrant agreed to extend the maturity dates of the Credit Agreements, each extension was limited in duration with increasingly strict conditions. (Tr. 362-64). As Emigrant threatened to place Ebury in default, Hanratty lied yet again to cover up his fraud scheme. On September 22, 2021, Hanratty created a forged collateral report (the "Forged MTAG Report"), which he sent to Jack Grady, EBC's managing director and the relationship partner for the Ebury account. The Forged MTAG Report purported to list the tax liens custodied by MTAG on behalf of Ebury as of August 31, 2021. (GX3024 and 3042A). According to the Forged MTAG Report, MTAG custodied more than 6,700 Ebury tax liens. (GX3042A). In reality, MTAG only custodied 518 liens. (*Compare*

GX 3042A *with* GX2066). The metadata for the Forged MTAG Report showed that the defendant had manipulated the data moments before sending it to Emigrant. (GX3042A). The defendant lied because he did not want Emigrant to discover his fraud. He knew that Emigrant had never given him permission to self-custody Ebury's tax liens. He knew that he had lied about this crucial fact for years. And he knew that, if he admitted truth, Emigrant would know he had committed fraud.

On November 29, 2021, Emigrant finally placed Ebury in default. (GX 3043, 3044). At the time of default, Ebury owed Emigrant approximately $18.25 million in principal and approximately $3.25 million in interest. (Tr. 131-32). Because working out a repayment plan remained in Emigrant's best interest, the bank continued to negotiate with the defendant. As Staudt testified, Emigrant wanted to give Hanratty the benefit of the doubt. (Tr. 128-30). Yet, as the negotiations proceeded, the red flags concerning the existence of the purported Ebury assets became too much to bear. Despite Hanratty's claims that he was overcapitalized and had millions of dollars in assets, he was unable to make even the most minimal downpayment as part of the settlement negotiations. (Tr. 128-30). There was a simple reason that Hanratty could not make a meaningful repayment—it was because Hanratty had been lying about the value of Ebury's tax lien portfolio for years. On September 25, 2022, Emigrant ceased all settlement negotiations and sued the defendant in civil court—a lawsuit Hanratty stayed pending resolution of this criminal matter. (GX 403, 403A).

## II. <u>Fraud on Kirkland</u>

In fall 2021, Hanratty committed yet another theft to conceal the fraud against Emigrant and his Ebury investors. In September 2021, Hanratty signed a loan agreement with Kirkland Capital ("Kirkland") for approximately $112,000 that was secured by an Ebury property at 619

Portland Avenue in Rochester, New York ("619 Portland Avenue"). Hanratty did not disclose to Kirkland (or Emigrant for that matter) that 619 Portland Avenue was already pledged as collateral to Emigrant. (GX3095). Having secretly re-pledged Emigrant's collateral, Hanratty used Kirkland's money to repay Emigrant in a last-ditch effort to stave off a default. (GX501).

In April 2022, Hanratty sold 619 Portland Avenue to a third-party for $95,000. Pursuant to the Kirkland loan agreement, Hanratty was required to notify and obtain Kirkland's *written* consent prior to selling 619 Portland Avenue. (GX3160). If Kirkland's written consent was granted, Hanratty was required under the agreement to immediately repay any outstanding loan balances. (GX3160 at 13). He did neither. (Tr. 931, GX3160, 3140, 3140A, 3164 (noting the loan was paid in full one year later on April 5, 2023)). Instead, Hanratty dodged inquiries from Brock Freeman, Kirkland's CEO, about the status of the loan. (GX3165).

Although Hanratty ultimately repaid Kirkland in April 2023, his failure to disclose that 619 Portland Avenue was (i) pledged to another lender, namely Emigrant, and (ii) had been sold for nearly a year before Hanratty repaid Kirkland's loan, meaningfully altered the risk profile of the loan for Kirland. As Brock Freeman testified, if Kirkland had known that Hanratty sold 619 Portland Avenue, it would have demanded repayment immediately. (Tr. 953).

## APPLICATION OF THE SENTENCING GUIDELINES

### I. Calculation of the Applicable Sentencing Guidelines

The defendant was convicted after trial of all four counts in the Indictment S1 24 Cr. 153 (LGS): wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Count One); bank fraud, in violation of 18 U.S.C. §§ 1344 and 2 (Count Two); and two counts of unlawful monetary transactions, in violation of 18 U.S.C. §§ 1957 and 2 (Counts Three and Four). The Probation Department calculated that the total offense level is 30. (PSR ¶ 46). The Government agrees with the Probation

Department's calculation, and submits that the Court should calculate the applicable Sentencing Guidelines as follows:

1. The November 1, 2025, edition of the United States Sentencing Guidelines manual applies in this case.

<u>Offense Level</u>

*Counts One and Two (the "Fraud Counts"):*

2. The sentencing guidelines applicable to Counts One and Two of the Indictment are U.S.S.G. § 2B1.1.
3. Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7.
4. Pursuant to U.S.S.G. § 2B1.1(b)(1)(L), because the actual loss amount was more than $25,000,000 but less than $65,000,000 the offense level is increased by 22 levels.[1]
5. Pursuant to U.S.S.G. § 2B1.1(b)(17)(A), because the defendant derived more than $1,000,000 in gross receipts from a financial institution as a result of the offense, the offense level is increased by 2 levels.
6. The total offense level applicable to Counts One through Two is 31.

*Counts Three and Four (the "Money Laundering Group"):*

7. The sentencing guideline applicable to Counts Three and Four of the Indictment is U.S.S.G. § 2S1.1.

[1] As described further below, the actual loss amount is derived as follows: $18,251,647.03, representing the outstanding principal owed by the defendant to Emigrant at the time of the November 21, 2021 default, (GX3043, 3044), and $8,610,00 the amount of money Ebury owed to Erickson, Santori, Skinner, and Leventhal, (Tr. 584, 606, 655, 683; GX2176), as established at trial. In total, the actual loss amount to these victims is $26,861,657.03.

8. Pursuant to U.S.S.G. § 2S1.1(a)(1), the base offense level is 31 because it is the offense level for the underlying offenses from which the laundered funds were derived.
9. Pursuant to U.S.S.G. § 2S1.1(b)(2)(A), because the defendant is convicted under 18 U.S.C. § 1957, the offense level is increased by 1 level.
10. The total offense level applicable to Counts Three through Four is 32.

Grouping

11. Pursuant to U.S.S.G. § 2S1.1 cmt. n.6, Counts One through Four are grouped pursuant to U.S.S.G. § 3D1.2(c) (the "Group").
12. Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the Group is the offense level for the most serious of the counts comprising the Group, *i.e.*, the highest offense level of the counts in the Group.
13. In accordance with the foregoing, the offense level applicable to the Group is 32.

Adjustments

14. Pursuant to U.S.S.G. § 4C1.1, because the defendant qualifies as a zero-point offender, the offense level is decreased by 2 levels.

Based upon the foregoing, the offense level is 30.

Because the defendant is in Criminal History Category I, his Guidelines range is 97 to 121 months' imprisonment.

**a. The Defendant's Challenges to the Guidelines Calculation Lack Merit**

In his sentencing submission, the defendant makes three challenges to the Guidelines calculation set forth in the PSR—(1) to the calculation of the loss amount, (2) to his failure to receive a two-point reduction for acceptance of responsibility, and (3) to the inability of the

Guidelines to appropriate reflect the nature of offense. As outlined below, the defendant's objections are without merit.

#### *i. The Evidence at Trial Proved That the Loss Amount Is At Least $25 Million*

The defendant takes issue with the loss amount as calculated in the PSR. His arguments are entirely meritless and fail to address the facts of this case or the governing law. The evidence at trial proved that the actual losses to Emigrant and Ebury investors are in excess of $25 million.

#### 1. <u>Applicable Law</u>

"Loss" is defined in the Guidelines as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. 3(A). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.*, cmt. 3(A)(i). And "reasonably foreseeable pecuniary harm" is defined as "pecuniary harm"—that is, "harm that is monetary or that otherwise is readily measurable in money"—that "the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.*, cmt. 3(A)(iii), (iv)).

"The sentencing court is only required to make a reasonable estimate of the loss." *United States v. Lacey*, 699 F.3d 710, 719 (2d Cir. 2012).[2] The evidence "need not . . . establish loss with absolute precision; it need only permit the district court to make a reasonable estimate of the loss given the available information." *United States v. Coppola*, 671 F.3d 220, 250 (2d Cir. 2012); *see also United States v. Bryant*, 128 F.3d 74, 75 (2d Cir. 1997). Moreover, the calculation of loss need only be determined by a preponderance of the evidence. *See United States v. Gonzalez*, 407 F.3d 118, 125 (2d Cir. 2005). "[B]ecause the sentencing court is in a unique position to assess the evidence and estimate the loss based upon that evidence, the sentencing court's loss determination

[2] Unless otherwise noted, case text quotations omit internal quotation marks, citations, and previous alterations.

is entitled to appropriate deference." *Lacey*, 699 F.3d at 720. The district court has "broad discretion" to consider "all relevant information" when making factual findings related to sentencing. *United States v. Pico*, 2 F.3d 472, 475 (2d Cir. 1993); *see also United States v. Prince*, 110 F.3d 921, 924 (2d Cir. 1997).

### 2. <u>The Trial Evidence Regarding Loss Amount</u>

Here, there are two categories of losses: losses to Emigrant and losses to Ebury investors.

#### *a. Losses to Emigrant*

First, the defendant's fraud on Emigrant resulted in a loss to Emigrant of $18,251,647.03, representing the amount of principal owed to Emigrant as of the date of default. (GX3043, 3044). Trial evidence established that if Hanratty had disclosed that (i) Ebury did not own the tax liens pledged as collateral, or that (ii) Ebury was not using a third-party custodian/servicer, Emigrant would not have advanced the defendant money and would have demanded full repayment of the outstanding loan amount. (Tr. 105-110 (Staudt discussing Ebury representations under the Credit Agreements and default remedies, including accelerated repayment); 112-14 (Staudt discussing the importance of a third-party custodian); 265-266 (same); 274, 279 (Staudt discussing the importance of Ebury owning the tax liens pledged); 364-65 (Staudt discussing reasons for placing Ebury in default)). Moreover, Hanratty's misrepresentations concerning the value of Ebury's tax lien portfolio between 2018 and 2020 were carried over with each subsequent borrowing submission regardless of whether the defendant submitted additional fake liens. As Arora explained, the borrowing base value was calculated on a rolling basis that was derived from the most recent submission. (Tr. 320-21 (discussing that the collateral for which Ebury borrowed against would roll forward with each new request, meaning that any false representation was carried through to additional cash advance requests)). As a result, once the defendant submitted

fake tax liens to artificially increase the borrowing base value, the value of those fake liens carried forward with each subsequent borrowing base submission. (*Id.*). Additionally, the fact that the defendant submitted fake tax liens, which were comingled with tax liens that Ebury owned, helped conceal and perpetuate the defendant's fraud scheme. By the time Emigrant placed the defendant in default in November 2021, the defendant owed Emigrant more than $18 million in outstanding principal. Thus, the actual loss to Emigrant is $18,251,647.03.

The defendant does not dispute that $18,251,647.03 is the outstanding principal owed to Emigrant under the Credit Agreements. Instead, he contends in conclusory fashion that this loss amount should be limited to $443,007.14. (Def. Br. at 9). The defendant's argument, however, is fatally flawed both on the law and the facts. As a threshold matter, Hanratty states, without any reasoning or citations, that $443,007.14 is the "amount that Ebury actually borrowed based [on] the false spreadsheets." (Def. Br. at 9, 23). Even limiting the analysis to the total amount Hanratty borrowed based on the eight fraudulent borrowing base materials presented at trial—a position that is contrary to Second Circuit precedent with respect to the facts of his case—the total amount borrowed as a result of Hanratty's fraudulent misrepresentations was $8,965,000. (GX3001, 3003, 3005, 3007, 3009, 3010, 3013, 3015).

Yet the trial record established that Emigrant's loss amount is not limited to the amount the defendant borrowed based on lies, but rather the outstanding principal value of the loan Emigrant made to the defendant, which was never repaid and which the tax liens were supposed to have collateralized but never did. *United States v. Turk*, 626 F.3d 743, 748-51 (2d Cir. 2010) (rejecting defendant's loss credit arguments and finding that the loss amount was appropriately based on the principal value of the loans the lender made to the defendant that were never repaid). This is because Hanratty's misrepresentations caused Emigrant to not only lend him money, but

also to refrain from demanding immediate repayment of money already lent. (Tr. 105-110, 320-21, 364-65). As the Second Circuit has explained, "[t]he guidelines provide that when an investor puts money into a fraudster's hands, and ultimately receives nothing of value in return, his loss is measured by the amount of principal invested[.]" *United States v. Hsu*, 669 F.3d 112, 121 (2d Cir. 2012).

Here, Hanratty was solely responsible for the lies made to Emigrant to obtain the bank's money: but for Hanratty's fraud, Emigrant would have immediately ceased lending to Ebury in October 2018—the date of the first fraudulent borrowing base (GX3002 and subparts); placed Ebury in default at a time when Ebury's outstanding loan balance was below $10 million (GX3002 and subparts; 3004 and subparts); and obtained a priority position above the Ebury equity investors in any liquidation or bankruptcy proceeding, (Tr. 352-53). But none of these things occurred. Instead, Hanratty repeatedly lied about the value of his tax lien portfolio, the collateral protections Ebury had in place to prevent fraud, and Ebury's financial stability. As a direct result of those lies, by early 2020, Hanratty was able to continue to borrow, amassing a loan balance of nearly $20 million. (GX3107A and 3107B). As such, it is proper to hold Hanratty responsible for the entirety of Emigrant's lost principal because of the fraud scheme. *See United States v. Stitsky*, 536 F. App'x 98, 112 (2d Cir. 2013) ("[B]ecause investors received nothing of value at the time the fraud was uncovered, the district court reasonably estimated the loss to be the principal amount invested by the victims of defendants' fraud."); *see also* U.S.S.G. § 2B1.1 cmt. 3(C)(i) (excluding interest, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs from the calculation of loss for purposes of the guidelines).

Hanratty's contention that he should not be responsible for the outstanding principal owed to Emigrant because not all of it was the result of Hanratty's fraudulent misrepresentations, (Def.

Br. 23-24), is belied by both the facts and the law. Between 2018 and 2020, Hanratty submitted borrowing base materials that contained false representations regarding the value of Ebury's tax lien portfolio, including the existence of millions of dollars of purported tax liens, the existence of a third-party custodian and servicer, and Ebury's use of Emigrant's money. These misrepresentations exposed Emigrant to the reasonably foreseeable risk that, as a result of the defendant's criminal behavior, Emigrant would lose—and in fact did lose—any unpaid principal lent to the defendant. Had the defendant not lied about these material items, namely, the existence of the collateral supporting the loan, the existence of fraud controls, and Ebury's dire financial condition, Emigrant would not have been exposed to the lending risk that resulted in the loss of nearly $20,000,000. *See United States v. Balboa*, 622 F. App'x 31, 32 (2d Cir. 2015) ("Balboa argues that the global economic downturn, rather than his fraudulent scheme, was the ultimate cause of the victims' loss and therefore, the actual loss attributable to the fraud was $0. Balboa's argument is foreclosed [by Second Circuit precedent]."); *see also Turk*, 626 F.3d at 750 ("[T]he Guideline does not hold defendants accountable only for certain or near-certain losses, but for losses that were 'reasonably foreseeable pecuniary harm'"; when a defendant "could not have obtained [his] victims' money" absent the deceit, "[i]t follows that a potential direct result" of that fraud "was the total loss of the moneys" obtained.).

The defendant's attempt to blame the pandemic for the multi-million-dollar loss amount should be swiftly rejected. First, as of May 2020, early in the pandemic, the borrowing base materials establish that the defendant owed Emigrant $19,126,011.03 based on outstanding debt incurred through 2019. (GX3106-3107 and subparts). Contrary to the defendant's argument, which was rejected by jury, there is no evidentiary basis to conclude that anything other than the defendant's own pre-pandemic conduct resulted in Emigrant's actual losses.

Despite these undisputed facts, the defendant asks this Court to give him an undefined credit against Emigrant's loss, claiming that the pandemic, in essence, prevented him from repaying Emigrant. (Def. Br. at 23-24). The Second Circuit, however, handily rejected a similar argument in *United States v. Turk*, 626 F.3d 743 (2d Cir. 2010), based on similar facts. The defendant in *Turk* pled guilty to mail and wire fraud offenses based on a mortgage fraud scheme. *Id.* at 745. As part of the scheme, the defendant persuaded lenders to loan more than $27 million purportedly for purposes of renovating apartment buildings. *Id.* As part of the loan agreements, the defendant falsely promised that the loans were collateralized by the recorded mortgages in the apartment buildings. *Id.* "In truth, no mortgages were recorded for the individual [lenders], and they were—contrary to what they were led to believe when they agreed to 'invest' with [the defendant]—unsecured creditors." *Id.* The defendant contested the reasonableness of his 60-month sentence, arguing that the district court failed to apply a credit for the market value of the apartment buildings.

The Circuit rejected the defendant's argument on multiple grounds. First, the Court noted that apartment buildings could not be considered "collateral," which is "property subject to a security interest," because the mortgage was never recorded. *Turk,* 626 F.3d at 748. As a result, much like the fake liens supplied to Emigrant, the victims held no collateral interest to deduct against the unpaid principal. Second, the Circuit also rejected the argument that the defendant should not be held responsible for "unforeseen market downturns," which diminished the value of the properties at issue. *Id.* at 749-50. The Court reasoned that the only loss that "need have been foreseeable to the defendant is the loss of the unpaid principal," not the "future value of the collateral." *Id.* at 750. "Put another way, a defendant may not reasonably count on the expected sale value of collateral to save himself from the foreseeable consequences of his fraudulent

conduct." *Id.* Adopting any other approach, "would be to encourage would-be fraudsters to roll the dice on the chips of others, assuming all of the upside benefit and little of the downside risk." *Id.*

Consistent with the Circuit's reasoning in *Turk*, there is no basis to apply a loss credit based on the impact of the pandemic on the housing market. There is no dispute that the defendant's fraudulent misrepresentations occurred prior to the onset of the pandemic. There is also no real dispute that, because of the defendant's misrepresentations, it was reasonably foreseeable that Emigrant stood to lose the entirety of its unpaid loan principal. The fact that the defendant hoped that under different circumstances the housing market would go up instead of down, which may have enabled him to repay Emigrant before the bank discovered his fraud scheme, is legally irrelevant. *Stitsky*, 536 F. App'x at 112 ("[T]he district court reasonably determined that no offset was warranted for losses resulting from changed economic circumstances because . . . investors would not have been exposed to such risks had defendants not fraudulently induced them to invest in the first instance."). Put simply, Hanratty cannot invoke the pandemic to insulate himself from responsibility for the loss he caused, namely, the loss of Emigrant's unpaid loan principal. *Turk*, 626 F.3d at 751.[3]

[3] Hanratty's reliance on *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006), *United States v. Rutkoske,* 506 F.3d 170 (2d Cir. 2007), *United States v. Olis*, 429 F.3d 540 (5th Cir. 2005), and *United States v. Cuti*, 08 Cr. 972 (DAB), 2011 WL 3585988 (S.D.N.Y. July 29, 2011) is misplaced. In general, *Ebbes, Rutkoske, Olis,* and *Cuti* are securities cases, which involved the valuation of share price when determining the applicable loss amount, which, by its nature, is highly susceptible to multiple valuation factors. *Ebbers*, 458 F.3d at 128, *Rutkoske*, 506 F.3d at 179, *Olis*, 429 F.3d at 546, *Cuti*, 2011 WL 3584988 at *4. *Ebbers* involved the sentencing of Worldcom's CEO, who was sentenced to 25 years for his role in a two-year fraud scheme resulting in losses well over $100 million. 458 F.3d at 113. The Court in *Ebbers* affirmed the reasonableness of the district court's loss calculation based on reasonable efforts to account for the multitude of different investors and market factors that were unrelated to the fraud that impacted Worldcom's share price. *Id.* at 128. In *Rutkoske*, the Circuit remanded because the district court failed to approximate the "amount of the loss caused by the securities fraud scheme without even considering other factors relevant to the decline" in share price, which was used as the main variable in the loss calculation.

### *b. Ebury Investors*

Second, the evidence at trial clearly supports the PSR's conclusion that the losses to Ebury investors amounted to at least $8,610,000, which was the total amount of principal lost by Ebury investors Santori, Leventhal, and Skinner after crediting any redemptions received by Ebury. (Tr. 584, 606, 655, 683; GX2176). Santori and Erickson testified that had the defendant informed them that Ebury was not using an independent custodian, they would have requested the return of their investment immediately because the custodian was supposed to be a check on potential fraud. (Tr. 585-86, 666). Yet contrary to these promises, trial evidence established that Ebury was self-custodying and self-servicing nearly all of its tax lien portfolio by 2020. (GX504 at 14). As Erickson explained, an investor does not "want to give [money] directly to the fund manager because technically the fund manager could steal 40 percent of it and declare, oh, the investments did poorly. [The investor would] never know." (Tr. 585). True to Erickson's own prediction, that is exactly what Hanratty did when he sidelined MTAG and secretly began self-custodying and self-servicing Ebury's tax lien portfolio. By deliberately not using a third-party custodian,

506 F.3d at 180. In *Olis*, another securities fraud case, the Fifth Circuit noted the challenges of using only the share price the day before and day after the fraud revelation and remanded for resentencing where the district court refused to even consider the impact of extrinsic factors on the share price decline that were supported by an expert report. 429 F.3d at 548. Finally, in *Cuti,* another securities fraud, the district court found that the Government had failed to put forth *any* evidence of loss where the Government's loss theory rested on an overbid theory, but there was no evidence that the overbid was based on fraudulent information. *Id.* at *4. Here, unlike *Ebbers, Rutkoske, Olis,* and *Cuti,* the loss calculation with respect to Emigrant does not involve the value of publicly traded securities or commodities subject to a multitude over variables. To the contrary, the actual loss amount to Emigrant is based on the amount of money lent to the defendant based on his misrepresentations—both facts amply established through witness testimony and trial exhibits. (Tr. 92, 111; GX501, 3001-3107). Moreover, even if the Court were to consider the loss to Emigrant prior to the onset of the pandemic—the only unforeseen market condition the defendant cites—the borrowing base materials, show that even prior to the pandemic, Emigrant's losses were over $18 million as a result of the defendant's fraud scheme. (GX3107A and B).

Hanratty was able to lie to Ebury investors about the value of the firm's assets, its ability to repay investors, and its purported liquidation process.

Hanratty's contention that these investor losses cannot be included in the loss calculation because he did not lie to "obtain" their money, but only lied to "retain" it, (Def. Br. at 23), is a distinction without merit. To "obtain" money or property, it is not necessary for the government to prove that a false or fraudulent statement or conduct was made prior to the victim's decision to part with money or property. *See Porcelli v. United States*, 404 F.3d 157, 162-63 (2d Cir. 2005) (rejecting defendant's argument that he could not be convicted of "obtain[ing] money or property" for money he already possessed, finding it sufficient to convict defendant of mail fraud where the fraud scheme involved him *keeping* money he already had by virtue of his not paying taxes); *cf. United States v. Gole*, 158 F.3d 166, 168 (2d Cir. 1998) (scheme to defraud where the defendant "intentionally misrepresented his income in order to retain pension overpayments"). Rather, if after having obtained money or property, the defendant devised or participated in a fraudulent scheme to deprive the alleged victim of that money or property by keeping the money or property through making a subsequent false or fraudulent misrepresentation as to a material fact, that is sufficient to establish the existence of a scheme to defraud.

This principle is also consistent with the U.S. Sentencing Guidelines, which define a victim for purposes of a sentencing loss calculation as "any person who sustained any part of the actual loss determined under subsection [2B1.1](b)(1)." U.S.S.G. § 2B1.1 cmt. 1. In turn, actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," *see* U.S.S.G. § 2B1.1(b)(1)(C)(i), which is subsequently defined as the monetary harm that "the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. § 2B1.1(b)(1)(C)(i), (iii), (iv). As directed by the Guidelines, the loss

calculation is not focused on whether the defendant "obtained" or "retained" the victim's money, but rather the victim's monetary harm was reasonably foreseeable as a result of the defendant's fraud scheme. Here, there is no question that Hanratty told Ebury investors that the firm was not using an independent, third-party custodian to safeguard the firm's assets, the Ebury investors would have demanded the immediate return of their investment. To prevent this from occurring, the defendant lied. The fact that his failure to retain such a custodian—the independent, third-party that was supposed to prevent the very fraud that defendant committed—resulted in the loss of their investment capital is reasonably foreseeable.

Based on the foregoing, the appropriate loss calculation for purposes of U.S.G.G. § 2B1.1 is $26,861,647.03, which results in a 22-level increase pursuant to Section 2B1.1(b)(1)(L).

**ii. <u>Hanratty Is Not Entitled to a 2-Point Reduction for Acceptance of Responsibility</u>**

Hanratty argues that he is entitled to a 2-point reduction for acceptance of responsibility, relying principally on Judge Rakoff's decision in *United States v. Tavberidze*, 769 F. Supp. 3d 264, 270 (S.D.N.Y. 2025). *Tavberidze* is contrary to Second Circuit law. In *United States v. Powell*, No. 24-1461, 2025 WL 3022475 (2d Cir. Oct. 29, 2025) (summary order), the Second Circuit rejected the argument that section 3E1.1 of the U.S. Sentencing Guidelines violates the Sixth Amendment right to trial. The defendant in *Powell*, like Hanratty, was convicted at trial and thus did not receive any reduction under Section 3E1.1. On appeal, relying in large part on *Tavberidze*, Powell argued that Section 3E1.1 "burdens the Sixth Amendment right to trial." *Id.* at *3; *see United States v. Powell*, No. 24-1461 (2d Cir.), Dkt. 49 at 53-56 (appellant's brief quoting extensively from the District Court's opinion in this case). The Second Circuit squarely rejected that argument, explaining that it "elides the distinction between increasing the severity of a sentence for a defendant's failure to cooperate and refusing to grant leniency." *Powell*, 2025

WL 3022475, at *3 (emphasis in original) (quoting *United States v. Whitten*, 610 F.3d 168, 195 (2d Cir. 2010)). "In light of this distinction, . . . a show of lenience to those who exhibit contrition by admitting guilt does not carry a corollary that the judge indulges a policy of penalizing those who elect to stand trial." *Id.* (quoting *United States v. DiMassa*, 117 F.4th 477, 484 (2d Cir. 2024)).

*Powell* continues the unbroken line of cases holding—contrary to *Tavberidze*—that Section 3E1.1 comports with the Sixth Amendment because it treats acceptance of responsibility as a basis for leniency but does not provide a harsher sentence for failure to plead. *See, e.g., Whitten*, 610 F.3d at 195-96; *United States v. Goffer*, 529 F. App'x 17 (2d Cir. 2013). Here, it can hardly be said that Hanratty has accepted any responsibility for his actions where he affirmatively states that he is innocent despite the jury verdict to the contrary. (Def. Mem. at 6 ("John continues to maintain that he is actually innocent of intentionally lying to EBCC via the eight borrowing bases on which the Government pursued its prosecution.")).

**iii. <u>The Guidelines Do Not Overstate the Seriousness of the Offense</u>**

Finally, Hanratty argues that the fraud Guidelines "approach to economic crime sentencing is arbitrary and unjustifiable." (Def. Mem. at 29). This argument is misguided for several reasons: the fraud Guidelines are the result of extensive and iterative work by the Sentencing Commission and sound policy choices. Moreover, even if the fraud Guidelines were overly reliant on loss as a general matter—a point the Government does not concede—they are an appropriate measure of the seriousness of the offense in this case.

"One of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008). "[T]he sentencing guidelines sought to address the inequities of prior sentencing practices that tended to

punish white collar economic crimes less severely than other comparable blue collar offenses." *Fishman*, 631 F. Supp. 2d at 403. Over a five-year period between 1996 and 2001, the Commission engaged in a deliberative process to address the Guidelines' treatment of white-collar offenses, with the involvement of relevant stakeholders including the defense bar, the Department of Justice, probation officers, and the U.S. Judicial Conference. *See* Federal Register Notice BAC2210-40, 62 Fed. Reg. 152, 171-74 (1997) (proposals by the Commission for comment regarding economic crime sentencing reform). The Commission explained the resulting amendments, which became effective on November 1, 2001, were based on the determination that "loss serves as a measure of the seriousness of the offense and the defendant's relative culpability." Sentencing Guidelines for the United States Courts, 66 Fed. Reg. 30,512, 30,533 (June 6, 2001). Thus, the 2001 amendments to Section 2B1.1 reflected the considered view of the Commission, following a collaborative process with relevant stakeholders, that loss amount should be a central consideration in determining the seriousness of an offense to which that Guideline applies. Indeed, "[e]ven if the enhancements may lack robust empirical support related to deterrence, they have foundations in empirical data and national experience related to the goals of fair sentencing and retribution." *United States v. Moose*, 893 F.3d 951, 958 (7th Cir. 2018).

In 2002, following major corporate fraud at Enron, WorldCom, and Adelphia, Congress instructed the Commission to amend the Guidelines for white-collar crime again, this time as part of the Sarbanes-Oxley Act, and in response the Commission amended the modified the loss-amount enhancement in Section 2B1.1 for high-loss cases — that is, cases involving loss amounts in excess of $200 million. *See* U.S. Sentencing Comm'n, Emergency Guidelines Amendments, 15 Fed. Sentencing Reporter 281, 283 (Apr 1, 2003) ("[T]he amendment expands the loss table at §2B1.1(b)(1) to punish adequately offenses that cause catastrophic losses of magnitudes

previously unforeseen, such as the serious corporate scandals that gave rise to several portions of the Act."), *available at* 2003 WL 22016909. Thus, to the extent Section 2B1.1 emphasizes loss amount to the degree it does, that was an intentional decision by the Commission based on years of consideration and guidance from Congress. *See Ebbers*, 458 F.3d at 129 ("[T]he Guidelines reflect Congress' judgment as to the appropriate national policy for [white collar] crimes.").

The defendant's argument otherwise draws on language from Judge Rakoff's decisions in *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), and *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), Judge Block's decision in *United States v. Parris*, 573 F. Supp. 2d 744, 753 (E.D.N.Y. 2008), and Judge Underhill's concurrence in *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013), which quotes from *Adelson*. All of those cases involved lengthy sentencing ranges recommended by the Sentencing Guidelines for defendants who personally had no or limited participation in causing any actual loss. For example, "Adelson was not the originator of the fraud, and, as the jury found in effect, Adelson did not participate in the fraudulent conspiracy until its final months," during which time the company's "stock was not further inflated." *Adelson,* 441 F. Supp. 2d at 513. In other word, "Adelson was closer (though not identical) to an accessory after the fact." *Id.* As a result, Judge Rakoff recognized that the Guidelines range of 85 years in prison could not account for the nuanced way in which the defendant participated in the scheme and resulted in a patently unjust advisory sentencing range. *Id.* Even after taking that factor into account, though, Judge Rakoff noted the importance of considering general deterrence in financial-fraud cases and imposed a three-and-a-half-year sentence: "notwithstanding all the mitigating factors outlined above, meaningful prison time was necessary to achieve retribution and general deterrence." *Id.* at 514. *Adelson* thus advocates implementing a meaningful custodial sentence in fraud cases, even when "it was undisputed at the

time of sentencing that [a defendant's] past history was exemplary." *Id.* at 513. Similarly in *Gupta,* Judge Rakoff noted that the defendant did not directly share in more than 60% of the monetary gain, which the Probation Department and Government used as the proper measure of the defendant's Guidelines points for an insider trading conviction—an issue not present here. *Gupta*, 904 F. Supp. 2d at 351.

In *Parris*, the defendants were engaged in a two-month "pump and dump" scheme in the penny stock market that resulted in approximately $2,500,000 in losses among hundreds of victims who traded the stock. 573 F. Supp. 2d at 746-49. As a result of their brief penny-stock fraud, even with no criminal history, the defendants faced an advisory Guidelines range starting at 30 years' imprisonment. Judge Block found this crime with that Guidelines range "not of the same character and magnitude as the securities-fraud prosecutions of those who have been responsible for wreaking unimaginable losses on major corporations." *Id.* at 746. The district court asked the government and the defendants to provide the court with a compendium of factually analogous cases nationally. *Id.* at 751-52. After considering those cases, the court ultimately sentenced the defendants to 60 months' imprisonment.

*Corsey* presented a similarly unusual situation warranting a variance. In *Corsey*, the defendants were prosecuted for trying to carry out an outlandish scheme against, what turned out to be, an FBI informant. "This was a clumsy, almost comical, conspiracy to defraud a nonexistent investor of three billion dollars. That scheme never came close to fruition." *Corsey*, 723 F.3d at 378. "This scheme amounted to a series of absurd lies piled on top of even more absurd lies." *Id.* at 379. However, the defendants in *Corsey* immediately faced a Guidelines calculation that was above the statutory maximum of 20 years and close to life in prison. It is in this context that Judge Underhill, in a concurring opinion, found the Guidelines to be of "low marginal value" for the case

at hand. But he did not say the guidelines were always of such little import. In fact, Underhill quoted *Adelson* in holding that in other instances, the Guidelines are "of considerable help to any judge in fashioning a sentence that is fair, just, and reasonable." *Id*. at 380.

While reasonable minds can disagree about the precise workings of the fraud Guidelines and whether they are unduly driven by loss, no one would argue that the size and scope of a financial fraud should be unrelated to the resulting sentence. It stands to reason that a defendant who engages in a longer, bigger fraud involving more victims should be punished more harshly than a defendant who engages in a short-term scheme (as in *Parris*), only joins the scheme late (as in *Adelson*), is not directly responsible for the gain amount used for the Guidelines calculation (as in *Gupta*), or does not harm real victims (as in *Corsey*). Here, by contrast, the defendant's crimes are significant not merely because of the loss amount, but also because of the defendant's central role in the execution of the fraud scheme; the fraud scheme's multi-year duration; the fraud scheme's impact on its victims, resulting in the closure of an entire corporate division of a mid-size bank; and the defendant's seemingly inability to accept responsibility for his crimes.

**A SENTENCE OF AT LEAST 72 MONTHS' IMPRISONMENT IS NECESSARY**

A criminal sentence must be crafted, among other things, to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and deter future criminal conduct. *See* 18 U.S.C. § 3553(a)(2). The "starting point" in making any sentencing determination, however, remains the United States Sentencing Guidelines. *Gall v. United States*, 552 U.S. 38, 49 (2007). Applying the Guidelines and taking into account all of the factors set forth in 18 U.S.C. § 3553(a), as fully set forth below, a sentence of at least 72 months' imprisonment is necessary to reflect the seriousness of the defendant's crimes, to promote respect for the law, to provide just punishment for the defendant's criminal conduct, to adequately deter criminal

conduct, and to protect the public from further crimes of the defendant. The aims of sentencing would not be served, however, by the defendant's proposed sentence. A sentence of six months' imprisonment, as the defendant proposes, would be woefully inadequate to satisfy the purposes of sentencing, and would send the wrong message to the defendant, to others considering committing fraud, and to the victims.

## II. <u>The Nature, Circumstances, and Seriousness of the Offense Warrant a Significant Sentence</u>

The nature, circumstances, and seriousness of the offense warrant a significant a sentence.

*First*, Hanratty perpetuated and concealed a multi-million-dollar fraud scheme at the expense of his lender and his investors—many of whom were friends and former colleagues. Relying on his investors' trust, Hanratty solicited tens of millions of dollars for tax lien investments. To grow his business even more, Hanratty turned to Emigrant for money. Ebury investors and Emigrant trusted Hanratty to abide by his word and adhere to the contractual promises that he made to ensure that Ebury's assets were protected. Time and again, Hanratty took advantage of that trust and exploited the complicated structure of the tax lien business to obtain desperately needed cash.

By mid-2018, Ebury's profits had declined, and Hanratty was faced with mounting investor redemption requests. Ebury's books and records made clear that the firm did not have the capital on-hand to payback Hanratty's investors. Although Hanratty was acutely aware that he was not in a financial position to satisfy the ever-increasing number of investor redemption requests, he refused to be honest to his investors about the firm's financial condition. Instead, he lied. He told Santori, Erickson, Salerno, and others that redeeming their capital investments was not an issue. He promised that he was "liquidating" Ebury's assets and would return their money within weeks. He promised that a big sale was just on the horizon. (GX2088, 2082, 3135). In reality, none of

these promises were true. Ebury did not have the financial reserves to repay multiple Ebury's investors. Hanratty did not have a plan to sell off significant portions of his tax lien portfolio and liquidate Ebury. If Hanratty was, as he claimed, "liquidating" Ebury, he would have been required to tell Emigrant, his lender, that he was doing so. But Hanratty knew he could not do that because Emigrant would (i) stop lending Ebury money—money that Hanratty desperately needed, and (ii) require immediate repayment of the entirety of its multi-million-dollar loan balance—a debt that Hanratty had no ability to repay.

Faced with this financially challenging situation—a situation faced by countless business owners across this country—Hanratty chose fraud as an easy way out. Instead of being honest with his investors and lender about Ebury's financial instability, Hanratty chose to lie to obtain money. Being honest increased the risk that Ebury would be placed in bankruptcy, investors would sue, Hanratty's reputation as a successful fund manager would be tarnished, and future investment prospects would dry up. By contrast, lying to Emigrant to obtain cash to pay Ebury investors was a quick fix. Lying gave Hanratty an opportunity to bet on positive future economic conditions with someone else's money. Lying gave Hanratty an opportunity to protect himself at the economic expense of others.

By September 2018, faced with multi-million-dollar redemption requests and declining profits, Hanratty turned to Emigrant to obtain fast cash. As the bank records established, on September 7, 2018, Hanratty used $3,300,000 from a $3,800,000 Emigrant cash advance to pay Leventhal and another $77,000 to pay off a second investor. (GX501). Absent Emigrant's money, which Hanratty falsely represented in the borrowing base materials that he would use exclusively to purchase new tax liens or run Ebury's tax lien business, Hanratty could not have paid these investors. (Tr. 1084). On October 5, 2018, Hanratty needed money yet again to pay another Ebury

investor, but the Ebury accounts were short. Instead, Hanratty used $90,000 from an Emigrant cash advance to cover the difference. (GX501).

Less than two weeks later, on October 15, 2018, Hanratty, needed additional cash to pay Salerno, who had arrived at the Ebury's offices, refusing to leave until he received money that Ebury did not have. To get himself out of this situation, on October 15, 2018, Hanratty submitted to Emigrant his first fraudulent borrowing base, which included nearly $85,000 worth of fake liens. (GX3001 and subparts, 502). These liens came from a "for sale" list that Hanratty had been offered just days before by a tax lien broker—tax liens that Hanratty had declined to purchase. (GX3209). To conceal the fact that he had not purchased the liens, Hanratty submitted these "for sale" liens to Emigrant in a spreadsheet with thousands of other tax liens that Ebury did in fact own. (GX3001 and subparts, 502). This commingling process made it difficult for Emigrant to uncover Hanratty's lies—uncovering the fraud would require checking the underlying property records for thousands of tax liens. Yet, Hanratty knew that Emigrant was not checking the underlying property records because he had falsely certified that both the borrowing base materials were accurate and that he was in compliance with the terms of the Credit Agreements. Recognizing that his lie had gone undetected, Hanratty committed fraud again and again—turning to Emigrant at least seven additional times between October 2018 and January 2020, receiving millions of dollars based on liens that Ebury did not actually own.[4] (PSR ¶19).

But the theft from Emigrant was not enough to turn around Ebury's fortunes: By December 31, 2019, Ebury Fund 1, the primary fund for the vast majority of Ebury investors, had seen a nearly 30 percent decline in annual returns. (GX2126A). By early 2020, the defendant owed Emigrant nearly $20 million and numerous Ebury investors, including Leventhal, Santori, and

---

[4] Contrary to Hanratty's suggestions—the fraud was not caused by the pandemic; the bulk of Hanratty's misrepresentations occurred before March 2020. (PSR ¶19).

Erickson had not been fully repaid. Any hope Hanratty had to conceal his lies by a market upswing were thwarted by the pandemic. By the end of 2020, with the Credit Agreement's maturity deadlines on the horizon, Hanratty knew that he needed to negotiate an extension. But in order to obtain an extension, Emigrant required a field exam, which threatened to expose Hanratty's lies. By the end of 2020, nearly one in every four liens in Hanratty's tax lien portfolio was fraudulent. Hanratty was forced to strip out the fake liens from the January 2021 Borrowing Base or risk the discovery of his fraud scheme. Once again, rather than coming clean, Hanratty lied to conceal his crimes. (GX3187). As the author of the January 2021 Borrowing Base, Hanratty removed the fake liens, but did not tell Emigrant the reason for the removal. (Tr. 347-48). Instead, he left the bank guessing at the reasons for the $17 million shortfall.

Throughout 2021, as Emigrant tried to reconcile the Ebury records with Hanratty's prior representations, Hanratty continued to lie and mislead Emigrant about the value of Ebury's tax lien portfolio and conceal the fact that Ebury had been self-custodying and self-servicing its tax lien portfolio for years. Hanratty failed to provide the field examiner with the requested documentation to complete the exam. When more questions arose about the value of the tax liens, Hanratty made promises that were not kept and falsely claimed that MTAG's failure to have the tax lien records was due to an "uploading" issue. Hanratty went so far as to submit the Forged MTAG Report to Emigrant to continue his farce. By November 21, 2021, Emigrant had lost more than $18 million and Ebury investors, Leventhal, Santori, Erickson, and Skinner had lost more than $8.5 million.

*Second*, the severity of the defendant's crimes is further amplified by the fact that they were long-running and not the product of a momentary lapse of judgement. Once the defendant learned that he could lie to Emigrant with impunity to obtain cash, he turned to Emigrant repeatedly for

money. Each time the defendant submitted fake liens that went undetected, he was emboldened to do it again. The defendant's crimes were not a one-time event arising, for example, from a split-second decision. Rather, Hanratty's crimes were the product of a series of decisions made over the course of years, and it was within his power to stop his crimes at any point in time. And at the end of the fraud, instead of coming clean, Hanratty continued to lie and even forged documents to conceal his fraud.

*Third*, Hanratty's crimes are serious because of their effect on the victims, which extend beyond economic loss. Ebury's nearly $20 million default in November 2021 had profound consequences for EBC, including the ultimate winddown of the division. As Staudt testified, EBC is a division of Emigrant Bank that makes loans to small businesses. (Tr. 91). In large part due to the financial impact of Hanratty's fraud scheme, EBC is no longer making new loans and is in the process of winding down the division. (*Id.*). The fact that an individual is single-handily responsible for the shuttering of an entire lending division—an entire business—and the loss of jobs—people's livelihoods—that followed is remarkable in the worst sense and deserving of a significant sentence. To the extent there has been any suggestion that the defendant's crimes had no impact because of the deep pockets of its victims, that is simply wrong. As Emigrant explained in its victim impact statement:

> As of today, Emigrant's prospects of recovering its losses are slight; Emigrant was forced to close its EBC business, and employees lost their jobs; and Emigrant has spent an enormous amount in legal fees in an attempt to be made even partially whole.
>
> ****
>
> Emigrant Bank is a family-owned, community bank established in New York City. The Bank's private lending subsidiary, EBC, primarily extends asset-backed and other corporate loans and leases to small businesses. Before working with the Defendant, EBC conducted thorough due diligence and felt confident that the deal's asset-backed structure and restrictive covenants provided sufficient security for

> EBC's loan. By the time EBC placed Ebury in default, the Defendant owed about $20 million—a significant sum for any bank, but especially salient for a smaller financial institution. Ultimately, as a result of the Defendant's actions, Emigrant Bank was forced to wind down EBC. Employees lost their jobs in the fallout, resulting in lost compensation and significant financial benefits, including future retirement and pension contributions.
>
> The Defendant's fraud and deception significantly harmed EBC's bottom line. *First*, the Defendant still has not repaid EBC any of the now over $30 million he owes. This includes over $18 million in principal that EBC lent the Defendant in reliance on his fraudulent certifications. *Second*, because the Defendant sold much of EBC's collateral to pay off other investors whom he had defrauded, and to fund both his lavish lifestyle and criminal defense costs, EBC has little chance of recovering its losses. *Third*, the Defendant's bad-faith delay tactics have forced EBC to expend significant resources litigating frivolous motions and filings, all while its collateral continues to depreciate in value.

(Victim Impact Statement, from Emigrant, dated January 5, 2026, attached hereto as Ex. A, at 2, 4). And, of course, Emigrant was not the only victim. Individual investors lost millions. To take an example: Michael Erickson explained the deep impact the defendant's fraud had on him and his family—not only monetarily but emotionally:

> What's more, given I was the one who encouraged my family to make such large investments in the Ebury Fund because 'it was so safe,' it resulted in my family losing almost all faith in my investment abilities and created an emotional rift which has taken years to repair. Additionally, I encouraged a number of my friends to invest in the Ebury Fund and, when we discovered Mr. Hanratty actually had lost money, that impacted my relationship with them.

(PSR ¶ 30).

*Fourth*, Hanratty's fraudulent actions spanned beyond Emigrant and Ebury investors, as evidenced by his lies to Kirkland. Hanratty did not think twice about the lending risks *he* created by re-pledging 619 Portland Avenue to Kirkland without disclosing that the property was already pledged to Emigrant. He also did not think twice before selling 619 Portland Avenue without obtaining Kirkland's consent or paying off the loan. Hanratty treated these fraudulent acts—lies to obtain money—as if they were nothing more than everyday business transactions. The fact that

Hanratty happened to pay Kirkland back in full does not diminish the fact that he thought nothing of lying to obtain money for his own personal benefit. These crimes—combined with his continued denial about his role in them—demonstrate that the defendant routinely chose to conduct his business in a manner that violated the law, and indeed, paid no heed whatsoever to legal or moral rules.

*Fifth*, Hanratty has never accepted responsibility for what he has done. At no point has he shown any willingness to admit culpability for fraud and deceit or show genuine remorse for his conduct. To the contrary, Hanratty "continues to maintain that he is actually innocent of intentionally lying to EBCC via the eight borrowing bases[.]" (Def. Mem. at 6). The evidence at trial proved, overwhelmingly, that Hanratty did intentionally take money that belonged to others and that he lied about it. After a two week trial, the jury took less than two hours to convict Hanratty.

What is obvious is that Hanratty never intended to get caught. From 2021 to 2022, he repeatedly lied to Emigrant and investors regarding the value of his tax lien portfolio and MTAG's role in custodying its assets. As if completely detached from the overwhelming trial evidence, the defendant brazenly suggest that he should receive credit for his efforts to repay EBC between 2021 and 2022 as if these efforts somehow diminish his wrongdoing. (Def. Mem. at 10-12). Notably, it is during this period that the defendant went to great lengths to avoid getting caught—creating the Forged MTAG Report, repeatedly lying about Ebury's use of MTAG, and failing to disclose that he had removed millions-of-dollars' worth of fake collateral from Ebury's records. Hanratty has never owned up to what he did. He has lied, obfuscated, and tried to minimize his own culpability, blaming McOsker, (Def. Mem. at 8), the pandemic, (*id.* at 9), and drinking, (*id.* at 13-

14). In assessing the seriousness of the offense, the Court should weigh heavily the fact that the defendant has never accepted responsibility.

*Sixth*, a sentence of at least 72 months' imprisonment would be in-line with recent fraud sentences across the district. *See United States v. Darden*, 23 Cr. 134 (VSB) (sentencing defendant to 12.5 years' imprisonment for fraud with $8 million loss); *United States v. Austin*, 23 Cr. 199 (PKC) (sentencing defendant to 18 years' imprisonment for fraud with $12 million loss); *United States v. Stergo*, 23 Cr. 20 (ER) (sentencing defendant to 51 months' imprisonment for fraud with $2.8 million loss); *United States v. Arntsen*, 23 Cr. 568 (PKC) (sentencing defendant to 9 years' imprisonment for fraud with $1.4 million loss).

In sum, the nature, circumstances, and seriousness of the defendant's conduct necessitate a significant sentence.

## III. <u>History and Characteristics of the Defendant</u>

Unlike many of the defendants who appear before this Court, Hanratty has enjoyed great advantages in his life. He is a highly educated professional. He finished college and law school and, as reflected in his letters of support, is surrounded by a community of family and friends. At the time he founded Ebury, he was the Chief Compliance Officer at a successful broker dealer. But none of this was enough for Hanratty. He wanted to have his own investment firm despite all the risks such a business endeavor entails. Yet, when his firm encountered financial difficulties, Hanratty—a lawyer and member of the bar who of all people should have known better—did not use his talents to surmount those difficulties in an honest, even if difficult manner, but instead committed a multi-million-dollar fraud against his lender and investors. This was plainly a crime of opportunity driven by self-preservation and greed. But even now, as he stands to be sentenced, Hanratty cannot truthfully acknowledge his motivation to the Court and attempts to deflect

responsibility for his serious crimes by placing the blame on others, much like he tried to do at trial.

Hanratty has submitted letters attesting to his positive qualities and expressing support. It is, of course, appropriate for the Court to take these letters into account in connection with sentencing. However, these attestations to Hanratty's positive qualities do not distinguish him from the typical defendant in a white-collar case. This collection of letters, as Judge Victor Marrero observed with respect to a defendant in another case:

> falls into a pattern advanced by a subset of the white collar criminal. This category encompasses a select class: distinguished, reputable, highly esteemed model citizens such as this defendant. The list of their achievements and virtues is long and impressive. Let us count the ways. At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors.

*United States v. Regensberg*, 635 F. Supp. 2d 306 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010); *see also United States v. Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail card").

The Government does not question that Hanratty was, at one time, a good family man, has made efforts to protect his sobriety, and has helped and supported others. But these positive qualities, while certainly admirable, do not set Hanratty apart from other similarly situated white-collar defendants—individuals who, although high-achieving and successful in their fields, and have the love and support of their family and others in the community, nonetheless choose to steal and defraud, and to hide that side of themselves, as Hanratty did, from their family, friends, and colleagues. Statements regarding Hanratty's recovery that he has "demonstrated thoughtfulness,

openness, and a willingness to confront difficult truths about himself," (Def. Mem. at 16), ring hollow in light of the fact that the most difficult truth that he refuses to confront is that he lied. He lied to obtain money to benefit himself. And he lied again to cover up his earlier lies. No amount of charity work and good deeds make up for these facts that Hanratty refuses to accept.

Any notion that highly successful white-collar criminals should be sentenced more lightly than defendants of a lower socioeconomic status cannot not be countenanced. "It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012); *see also United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) ("In imposing a sentence of one day with credit for the day of processing, the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life. '[N]one of these things are [his] sentence. Nor are they consequences of his sentence'; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment."); *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."). And, as the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999).

As Judge Colleen McMahon explained in *United States v. Binday*, a case that involved an insurance fraud scheme where the defendant was sentenced to 144 months' imprisonment, "[o]nly if white collar crime is punished commensurate with the damage it inflicts on society will citizens actually believe that the law metes out equal right to the poor and to the rich, which words are the cornerstone of the judicial oath." (12 Cr. 152 (CM), Dkt. No. 349, Sent. Tr. 46; *see also id.* at 45 ("There are crimes for which a critically important component of sentencing should be to send a message to the community, for the industry that this kind of behavior is intolerable, and to send a message to the community and to the industry that this sort of behavior is every bit as reprehensible as the types of crimes for which I and others like me routinely send poor, disadvantaged persons to prison for dozens of years.")); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("While no defendant should be made a martyr to public passion, meaningful punishment is still necessary to reaffirm society's deep-seated need to see justice triumphant. No sentence of probation, or anything close to it, could serve this purpose.").

Finally, this Court should put little weight on the fact that Hanratty is a first-time offender. Lawyers, financial advisors, and other professionals who are convicted and sentenced for white-collar crimes are almost always first-time offenders. Moreover, this is not a case where the offense conduct was wildly aberrant or prompted by a brief lapse in judgment and where, as a result, it might be appropriate to give more weight to the defendant's otherwise law-abiding life. For nearly five years, Hanratty methodically perpetrated a fraud scheme against his lender and investors, causing them to lose tens of millions of dollars. This prolonged, greed-driven criminal conduct warrants serious punishment.

## IV. A Sentence of At Least 72 Months' Imprisonment Is Necessary to Protect the Public and for Specific Deterrence

Under Section 3553(a), the need for the sentence to "protect the public from further crimes of the defendant" and "afford adequate deterrence to criminal conduct" must be considered. 18 U.S.C. § 3553(a)(2)(B), (C). Here, a sentence of at least 72 months' imprisonment is necessary to serve this purpose.

A courts have observed, "[i]t's very easy sometimes … to say, well, look at all the trouble the defendant has gotten himself into, look at the harm that's been done to his family, look at the loss he suffered himself, there is no way he'll ever do something like this again." *United States v. Laguardia*, No. 19 Cr. 893 (LAK) (S.D.N.Y. Aug. 31, 2021) (Sent. Tr. at 45). But "in the case of someone who, at least when they got into it, thought everything was going to work out fine," there is the possibility that "the next time temptation comes along, you'll think it will work out fine, too, and the bad outcome the first time was a mistake," and so the sentence must "reflect[] some of that risk." (*Id.*) Indeed, the fact that a past fraud does not necessarily deter a future one is evidenced by the number of first-time fraudsters in this district who have become recidivists. *See, e.g.*, *United States v. Jonathan Ghertler*, No. 23 Cr. 100 (ER) (investment fraud scheme following over a dozen prior convictions); *United States v. Franklin Ray*, No. 22 Cr. 228 (AT) (orchestrating a Ponzi scheme after having serving a prior two-year sentence for bank and wire fraud); *United States v. Vitaly Borker*, No. 22 Cr. 273 (JSR) (defendant convicted of wire fraud for operation of fraudulent eyeglasses website after two prior federal convictions for the same conduct); *United States v. Joseph Meli*, No. 19 Cr. 480 (RA) (defendant convicted of participating in a Broadway ticket resale investment fraud scheme after previously serving a 78 month sentence for the same scheme); *United States v. Edward Durante*, No. 15 Cr. 171 (ALC) (beginning new investment fraud scheme while serving a 121 month sentence for fraud); *United States v. John Galanis*, No. 15 Cr. 643

(PKC) (defendant convicted of convicted of securities fraud after 1973 and 1988 convictions for mail fraud and securities fraud).

The risk of recidivism here is real, and little of the defendant's sentencing submission addresses it.

First, the defendant's criminal conduct to date demonstrates that the defendant is undeterred from criminal conduct based on the potential to damage to others, the possibility of incarceration, or respect for the law. Despite the overwhelming evidence that he lied time and time again to obtain money and then, lied again to cover up his crimes, he maintains that he is "actually innocent." (Def. Mem. at 6). The defendant was present for the two-week trial where numerous witnesses and hundreds of documents were admitted showing that the defendant (i) received the "for-sale" lists of tax liens; (ii) directed the submission of the "for-sale" lists to Emigrant; (iii) falsely certified that he was in compliance with the Credit Agreements; (iv) lied about using MTAG as a custodian-servicer, including submitting the Forged MTAG Report; (v) lied about using Ebury's assets to payoff investors and liquidate the funds; and (vi) even lied to Kirkland about the sale of 619 Portland Avenue. For him to claim "actual innocence" in the face of these facts suggest that the defendant sees his criminal conduct as normal business activity. The defendant has already proven adept at crafting narratives that please his audience, and his sentencing submission itself shows that he is already attempting to reframe his crimes as mere mistakes or misunderstandings. And so it is conceivable that absent a meaningful sentence, the defendant will walk away with the impression that his actions were not serious and did not harm anyone. A significant period of incarceration is warranted to address this erroneous belief.

## V. A Sentence of At Least 72 Months' Imprisonment Is for General Deterrence

A meaningful sentence of imprisonment is also necessary in this case to afford adequate general deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B). "Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it." *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994); *see also United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quotation marks and citation omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"). Here, a sentence of at least 72 months' imprisonment is necessary to serve that purpose.

The sentence imposed in a case like this must send a clear message that not only is this kind of conduct criminal, it is serious, and it will lead to serious consequences for the perpetrators. *See, e.g., United States v. Johnson*, No. 16 Cr. 457 (NGG), 2018 U.S. Dist. LEXIS 71257, at * (E.D.N.Y. Apr. 27, 2018) ("The need for general deterrence is particularly acute in the context of white-collar crime….'[p]ersons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed.'") (quoting *United States v. Stein*, No. 09 Cr. 377 (JW), 2010 U.S. Dist. LEXIS 16745, at *3 (E.D.N.Y. Feb. 25, 2010)). Additionally, these types of financial crimes can often be challenging to identify, investigate, and prove. Indeed, in the instant case, the defendant continued his criminal conduct, undetected, for years. Because crimes like the defendant's may often go unprosecuted, the punishment imposed in a case like this sends an

important message of general deterrence to would-be wrongdoers. *See United States v. Zukerman*, 897 F.3d 423, 429 (2d Cir. 2018) (quoting *United States v. Herrernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) for the proposition that "[c]onsiderations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish…."). The imposition of significant sentence of imprisonment is necessary to provide adequate deterrence to future criminal conduct of the sort the defendant carried out.

## VI. RESTITUTION AND FORFEITURE

The Government respectfully requests that whatever sentence is imposed include the imposition of forfeiture in the amount of $26 million and restitution in the amount of $38 million.[5]

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a sentence of at least 72 months' imprisonment is appropriate and would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Dated: New York, New York
January 9, 2026

Respectfully submitted,

SEAN S. BUCKLEY
Attorney for the United States
*Acting Under Authority Conferred*
*By 28 U.S.C. § 515*

By: s/ ______________________________
Danielle Kudla

[5] This represents the amount owed to investors (PSR ¶122) in addition to the amount owed to Emigrant, which is $18 million in principal and $12 million in prejudgment accrued interest and fees. *See United States v. Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011) ("[T]he MVRA allows a sentencing court to award prejudgment interest in a criminal restitution order to ensure compensation 'in the full amount of each victim's losses.'" (quoting 18 U.S.C. § 3664(f)(1)(A))). In contrast, the forfeiture amount excludes this interest. 18 U.S.C. § 982 (The Court "shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation.").

Adam Sowlati
Assistant United States Attorneys